1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   MARK MANN et al.,                )   Case No. 3:11-cv-0708-GPC-BGS
                                       )
12                                     )   **ORDER**
                  Plaintiffs,          )
13                                     )   **(1) GRANTING IN PART AND**
     v.                                )   **DENYING IN PART**
14                                     )   **DEFENDANTS' MOTION FOR**
                                       )   **SUMMARY JUDGMENT (ECF**
15   COUNTY OF SAN DIEGO et al.,       )   **NO. 77);**
                                       )
16                                     )   **(2) DENYING PLAINTIFFS'**
                  Defendants.          )   **MOTION FOR SUMMARY**
17   _____  )   **JUDGMENT (ECF NO.  80)**

18

19          In this civil rights case, Mark and Melissa Mann and their four minor children

20   allege that defendant County of San Diego ("County") and several of its employees

21   from defendant County of San Diego Health and Human Services Agency ("HHSA")

22   violated the family's civil rights during a child abuse investigation that led to the

23   removal of the minor children from the family's home. (ECF No. 1.)  Before the Court

24   are the parties' cross-motions for summary judgment.

25          Defendants move for summary judgment, or partial summary judgment, on issues

26   of immunity.   (ECF No. 77.)   Plaintiffs have filed a response in opposition to

27   Defendants' motion, (ECF No. 97), and Defendants have filed a reply in support of

28   their motion, (ECF No. 101).

Plaintiffs move for partial summary judgment on four discrete factual and legal issues that form the basis of their eight causes of action.[1] (ECF No. 80.) Defendants have filed a response in opposition to Plaintiffs' motion, (ECF No. 96), and Plaintiffs have filed a reply in support of their motion, (ECF No. 100).[2]

The Court deems the parties' motions suitable for disposition without oral argument. See CivLR 7.1.d.1. Having considered the parties' submissions and the applicable law, and for the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' motion and **DENY** Plaintiffs' motion.

## BACKGROUND[3]

Plaintiffs are two parents, Mark and Melissa Mann, who have four children: N.G.P.M., born in 2004, and three triplets born in 2006—N.E.H.M., M.C.G.M., and M.N.A.M. Mr. and Ms. Mann have a history of having difficulty controlling the behavior of their children and of disciplining their children by striking them with wooden spoons.[4]

The facts giving rise to this case began on April 5, 2010. At that time, Mr. Mann was responsible for caring for the children in the evening when Ms. Mann was at work.

---

[1] Plaintiffs request that the Court take judicial notice of two district court cases. The Court, however, denies Plaintiffs' request, as judicial notice is reserved for notice of adjudicative facts only. See Fed. R. Evid. 201(a). The Court has nonetheless reviewed and considered the cases as set forth herein.

[2] Defendants incorporate their moving and reply papers into their opposition to Plaintiffs' motion for summary judgment, and Plaintiffs incorporate their moving and reply papers into their opposition to Defendants' motion for summary judgment.

[3] Plaintiffs move to strike Defendants' separate statement of undisputed material facts as untimely and incomplete pursuant to this Court's chamber rules governing civil proceedings, which require motions for summary judgment to be accompanied by a separate statement of undisputed facts. The Court agrees Defendants' separate statement is untimely and incomplete, but declines to strike it as Plaintiffs' suggest. See Miranda v. S. Pac. Transp. Co., 710 F.2d 516, 521 (9th Cir. 1983) ("District courts have broad discretion in interpreting and applying their local rules."). Defendants are admonished, however, to comply with this Court's chambers rules and this District's Civil Local Rules, as future failures to comply with said rules will not be tolerated.

[4] In 2009, the family appeared on the television show "Supernanny" to learn new methods of controlling the children's behavior. At that time, the parents stated their intention to stop using wooden spoons to strike their children as a form a discipline, but apparently resumed using wooden spoons by the time the events giving rise to this action occurred in April 2010. The parents report they learned to use a wooden spoon in a parenting class offered at their church.

After making smoothies for the children, N.E.H.M. (one of the triplets) began misbehaving. Mr. Mann told the children to go upstairs to bathe while he cleaned up a smoothie that one of the children had spilled. A short time later, Mr. Mann discovered N.E.H.M. was splashing soapy water around the bathroom. Mr. Mann therefore struck N.E.H.M. once with a wooden spoon. Mr. Mann was apparently aiming for N.E.H.M.'s buttocks but missed and struck her lower back instead. Because N.E.H.M. was naked (in preparation for taking a bath), the spoon left a red welt with the outline of a spoon on N.E.H.M.'s lower back. N.G.P.M. reported that another of the triplets, M.N.A.M., was also splashing soapy water. Mr. Mann thus had M.N.A.M. step out of the bathtub, and Mr. Mann struck him once on the buttocks with the wooden spoon. This also left a mark.

The next day, April 6, 2010, N.E.H.M.'s preschool director called Mr. Mann after observing the mark left on her lower back. Mr. Mann went to the preschool and explained the circumstances of the prior night. The preschool director told Mr. Mann she was nonetheless required to report the incident as an instance of possible child abuse. The preschool director called HHSA's child abuse hotline in Mr. Mann's presence and reported the incident, including Mr. Mann's explanation and the fact that Mr. Mann was cooperative and willing to talk about the incident.

On the same day, April 6, 2010, a HHSA protective social worker, defendant Andrea E. Cisneros (now Hernandez) ("Cisneros") went to the Mann home to investigate, but no one was home.

On April 7, 2010, Cisneros went to interview N.G.P.M. (the then six-year old) at her school pursuant to California Penal Code § 11174.3.[5] N.G.P.M. stated she was comfortable speaking with Cisneros alone, and the interview lasted approximately

---

[5] California Penal Code § 11174.3 provides in part:

Whenever a representative of a government agency investigating suspected child abuse or neglect or the State Department of Social Services deems it necessary, a suspected victim of child abuse or neglect may be interviewed during school hours, on school premises, concerning a report of suspected child abuse or neglect that occurred within the child's home or out-of-home care facility.

fifteen minutes. N.G.P.M stated she felt safe at home and denied any domestic violence or sexual abuse. N.G.P.M. also stated that her parents sometimes "look upset and yell" and that her parents disciplined her by giving her a "time out or a whoopin'," which N.G.P.M. explained as three to four spanks on her bottom with her clothes on. N.G.P.M. denied that the triplets ever receive "whoopin's" but that, instead, they are given time outs.

After the school interview, Cisneros went back to the Mann home. Ms. Mann was home, and she let Cisneros in to physically inspect and interview the children. Cisneros photographed the mark on N.E.H.M.'s lower back. Ms. Mann stated Mr. Mann was stressed and that he had a "horrible" night with the children on April 5, 2010. Ms. Mann stated she was open to receiving services. Cisneros then left the home, stating she would next interview Mr. Mann before discussing her investigation results "in committee."

When Cisneros left the home, she consulted with her supervisor, defendant Lisa J. Quadros ("Quadros"). Quadros told Cisneros that Cisneros needed to return to the Mann home to have Ms. Mann sign a voluntary safety plan. Cisneros thus returned to the home and told Ms. Mann she needed to complete an additional form. Ms. Mann took issue with signing the form because it stated that Mr. Mann could not be left alone with the children and because Ms. Mann believed Cisneros should talk to Mr. Mann about the incident before she signed anything. Cisneros told Ms. Mann that if she did not want to engage in voluntary services, which included signing a safety plan, the children could be removed from the home. Ms. Mann then signed the safety plan.

After Cisneros left, Ms. Mann called Quadros to complain that Cisneros said she would talk to Mr. Mann and then discuss her findings with a committee before taking action but, instead, came back to get the safety plan signed. In her deposition, Quadros testified that Cisneros did not use best practices when she returned to the home, and that, if she had used such practices, the dynamic between Ms. Mann and Cisneros would have been different. Quadros said, for example, that Cisneros should have told

Ms. Mann that Cisneros was stepping outside to talk with her supervisor and would return.

After interviewing Ms. Mann and the children on April 7, 2010, Cisneros went to Mr. Mann's work where she interviewed him. Mr. Mann recounted the events of the evening of April 5, 2010. Mr. Mann said he was open to receiving services. Cisneros then had Mr. Mann sign a safety plan, in which Mr. Mann agreed not to use physical discipline on the children. Mr. Mann also explained that Ms. Mann had called him and was very upset that her safety plan required that Mr. Mann not be left alone with the children. Thus, Mr. Mann and Cisneros agreed that his safety plan would require him to have a third party present only when help was needed to adequately care for the children. Similar to her conversation with Ms. Mann, Cisneros told Mr. Mann that his children could be removed from the home if he was not cooperative with voluntary services, which included signing a safety plan.

On April 8, 2010, Cisneros called Ms. Mann to inform Ms. Mann that Cisneros would need to return to the home to also photograph the mark on M.N.A.M.'s buttocks (the mark left by Mr. Mann when he had M.N.A.M. get out of the bath tub). Ms. Mann stated she did not want Cisneros to return to the home because of Cisneros' the previous day. Ms. Mann called Quadros to request a new social worker, which Quadros refused. Ms. Mann then asked to speak with Quadros' supervisor, defendant Gilbert Ferro ("Ferro"). After Ms. Mann talked to Ferro, Ferro agreed to have a more experienced social worker accompany Cisneros to the home.

Later that day, on April 8, 2010, Cisneros and a more experienced social worker, defendant Angela Redmond ("Redmond"), visited the home. While there, the social workers noticed an additional bruise on M.N.A.M.'s forehead, which Ms. Mann explained was the result of him bumping his head on the counter top. The social workers stated they would also need to photograph M.N.A.M.'s forehead, which upset Ms. Mann. Ms. Mann allowed the social workers to take the picture then told them to get out of the house. The social workers took the pictures and left.

That evening, on April 8, 2010, Ms. Mann called Quadros and left a message stating she "just lost it" when Redmond said they would need to photograph M.N.A.M.'s forehead. Ms. Mann stated, "it just feels manipulative like you're making this out to be something that it's really not." She continued, "I said go ahead take the picture and I'd like you to leave and probably wasn't as courteous as I could have been. But this is really difficult." Ms. Mann asked that Quadros return her call to discuss her concerns.

Quadros did not return Ms. Mann's call on April 8, 2010, so Ms. Mann called Quadros again on April 9, 2010. During that conversation, Ms. Mann asked what she could do to show the children were not in danger and volunteered to take the children to their pediatrician. Quadros asked that the children be taken to the Chadwick Center at Rady Children's Hospital ("Children's Hospital") for an examination.

That day, April 9, 2010, Mr. Mann took N.E.H.M. and M.N.A.M. to Children's Hospital where they met Cisneros. At Children's Hospital, a physician conducted a "Suspected Child Physical Abuse and Neglect Examination" on the two children in Cisneros' presence. The physician, non-defendant Dr. Joyce Adams, observed the mark on N.E.H.M.'s lower back and concluded it was consistent with Mr. Mann's story. Dr. Adams further stated, "It is clear that parents need additional help in managing the behavior of the children and learning effective non-physical ways of discipline." Dr. Adams did not make a mandatory report of suspected child abuse, noting the incident was "already reported to CPS." Regarding M.N.A.M., Dr. Adams observed a small red abrasion on M.N.A.M.'s buttocks. As for the bruise on M.N.A.M.'s forehead, Dr. Adams concluded the injury was "most likely accidental."

At some point around this time, and without first informing Mr. and Ms. Mann, Cisneros began preparing an "Application and Declaration for Protective Custody Warrant" ("Warrant Application") and a "Detention Report" to initiate dependency proceedings for the removal of the Mann children from their home. Over the following weekend, April 10-11, 2013, Cisneros prepared a draft Warrant Application and

Detention Report. Cisneros' draft Detention Report was thirteen pages long and included entries from the Delivered Service Log ("DSL") indicating Mr. and Ms. Mann had complied with the requests of Cisneros and other HHSA employees. The draft Detention Report also contained facts regarding Ms. Mann's complaints to Quadros and Ferro, and their responses to Ms. Mann's complaints.

On Monday, April 12, 2013, Cisneros gave Quadros her draft Detention Report and Warrant Application. At Quadros' direction, Cisneros deleted approximately two pages of information. As identified by Plaintiffs, such deleted information included:

- a report by school officials on April 7, 2010, that they had not seen bruises or marks on the children before the one inflicted on N.E.H.M.;

- Cisneros' interaction with Ms. Mann on April 7, 2010, where Cisneros returned to the home after speaking with her supervisor to have Ms. Mann cooperate with Voluntary Services, including signing a safety plan, or risk the children being removed from the home;

- Ms. Mann's complaint to Cisneros on April 7, 2010, that Ms. Mann did not like the way Cisneros conducted herself upon returning to the home to have Ms. Mann sign a safety plan;

- a portion of the voice message Ms. Mann left for Quadros on the evening of April 8, 2010, in which Ms. Mann expressed concerns about Cisneros and Redmond and asked that Quadros call her back;

- Ms. Mann's request of Quadros on April 8, 2010, that the family be assigned a new social worker;

- Ms. Mann's conversation with Ferro, and the reason Redmond was sent with Cisneros to the home on April 8, 2010;

- Ms. Mann's call to Quadros on April 9, 2010, in which Ms. Mann suggested that the children be seen by their pediatrician;

- Mr. and Ms. Mann's agreement to take the children to Children's Hospital.

Cisneros also added language to the Detention Report, stating:

> Mr. and Mrs. Mann agreed to receive Voluntary Services through the Agency; however they have not been cooperative in allowing the Agency to conduct an investigation. Mrs. Mann has been confrontational and hostile toward the Agency and has refused to cooperate with this worker [i.e., Cisneros]. The Agency has concerns of the safety of the children in the home and the parents' cooperation with a Voluntary Case.

Cisneros also added language, stating, "Mrs. Mann was not cooperative with me" as to the April 8, 2010 visit with Redmond. Notwithstanding these conclusions, Cisneros testified at her deposition that she could not recall an instance where either Mr. or Ms. Mann did not comply with a request by HHSA personnel. Cisneros agreed the parents ultimately cooperated with HHSA.

As noted by Defendants, the final Detention Report <u>did</u> include the following facts regarding the parents' cooperation:

- on April 7, 2010, Ms. Mann allowed access to the home and explained what occurred on April 5, 2010;
- on April 7, 2010, Ms. Mann cooperated in creating a safety plan;
- on April 7 and 8, 2010, Ms. Mann cooperated in allowing N.E.H.M. and M.N.A.M. to be photographed;
- Mr. Mann allowed the social workers into the home on April 8, 2010;
- on April 7, 2010, Mr. Mann explained the April 5, 2010 incident to Cisneros and admitted to striking the children;
- Mr. Mann said he did not want to strike the children again;
- Mr. Mann cooperated in creating a safety plan;
- Mr. Mann said he felt overwhelmed;
- Mr. and Ms. Mann agreed to receive voluntary services.

Based on the Detention Report and the Warrant Application (which incorporated much of the Detention Report), the Juvenile Court Division of the San Diego Superior Court ("Juvenile Court") issued a Protective Custody Warrant, and, on April 12, 2013, the children were removed from the home and sent to Polinsky Children's Center

("Polinsky").

Upon their arrival, a nurse took the children's vital signs, checked for lice, and otherwise did a cursory examination. The next morning, on April 13, 2013, a physician (the now dismissed defendant Dr. Nancy Graff), performed medical examinations on the four children, which she testified was done pursuant to a Juvenile Court general order and pursuant to a contract with the County.[6] The examinations included an assessment of the children's general appearance, behavior/mental status, skin, head, eyes, ears, nose/mouth/teeth, throat, neck, thyroid, lymph system, chest, lungs, heart/pulse, abdomen, muskuloskeletal system, and neurological health. The examinations also included a visual inspection of the children's external genitalia, including, for the girls, examination of the hymen. Blood and urine samples were also taken from the children. To examine the hymen, Dr. Graff would have the girls "drop their legs into a frog leg situation and generally separate the labia and look at the hymen, and that would be the extent of the exam."

Dr. Graff testified that, when children were brought in on allegations of abuse,

_____

[6] The general order, dated February 1, 2007, and signed by Judge Susan D. Huguenor ("General Order"), provides in part:

Pursuant to Welfare and Institutions Code ("WIC") sections 305, 306, 324.5, 369, and 361.2(e), in situations where (1) a child is in the custody of [HHSA] and (2) no detention hearing as taken place, THE COURT HEREBY ORDERS:

    1.    HHSA may obtain a comprehensive health assessment as recommended by the American Academy of Pediatrics . . . for a child prior to the detention hearing in order to ensure the health, safety, and well-being of the child. The assessment may include one or more of the following, as is necessary and appropriate to meet the child's needs:

    a.    A medical history . . . .
    b.    A physical examination by a licensed medical practitioner.
    c.    A developmental evaluation.
    d.    A mental health status . . . .
    e.    Emergency dental care . . . .
    f.    Clinical laboratory tests or X-rays as deemed necessary by the examining physician . . . for evaluation of the child's health status.

she would look closely for any evidence of physical abuse, and would document and photograph any signs. Dr. Graff also testified that parents (even non-offending parents) were not notified of the examination and were not allowed to be present at the examination because parents were not allowed in Polinsky except for visitation and, even then, parents were to remain in the visitation area.

Around the same time as the examinations on April 13, 2010, Mr. and Ms. Mann were at the detention hearing at the Juvenile Court. After the detention hearing, Mr. and Ms. Mann signed consent forms, that included permission for HHSA to administer "medical, developmental, dental, and mental health care . . . while he or she is any facility operated by [HHSA] . . ., if the treatment is recommended by a licensed physician . . . ." The consent forms further stated that "[m]edical . . . care can include: Routine admission and placement examinations, including blood test, immunization, cervical cultures . . . X-ray examination, local anesthesia, medical or psychiatric diagnosis or treatment."

Sometime after the detention hearing, HHSA submitted a report, pursuant to California's Child Abuse and Neglect Reporting Act ("Reporting Act"), that the agency had made a "substantiated" finding of physical abuse by Mr. Mann. This resulted in Mr. Mann being listed as a "substantiated" child abuser on California's Child Abuse Central Index ("CACI"). Along with two attorneys, Mr. Mann attended a hearing for the removal of his name from CACI but decided not to proceed with the hearing after being told he could only be represented by one attorney at the hearing.

The children were released from Polinsky on April 14, 2013, to the custody of their paternal grandmother who agreed to move into the Mann home. During the pendency of the court investigation, Mr. and Ms. Mann were not to be left alone with the children.

On April 17, 2013, Cisneros and Quadro were relieved from the case, and a court investigation social worker, defendant Kelly Monge ("Monge") was assigned to the case under the supervision of defendant Susan Solis ("Solis"). After Monge and Solis

took over the investigation, they continued to have concerns that Mr. and Ms. Mann did not have sufficient control over their children and would again resort to inappropriate physical discipline. Despite this, Monge and Solis later said Mr. and Ms. Mann were "ideal clients." On June 24, 2010, Monge and Solis offered Mr. and Ms. Mann the opportunity to engage in "Voluntary Court Services." Mr. and Ms. Mann declined, however, because they would have been required to admit the allegations contained in HHSA's petition.

On July 14, 2010, after a trial, the Juvenile Court, Judge Cynthia Bashant, found that Mr. Mann's inflicted physical harm for disciplinary reasons and that the discipline was excessive. The Court found, however, that the physical harm itself was not excessive. The Juvenile Court observed that the real issue was whether there was a substantial risk that the child would suffer serious physical harm inflicted non-accidentally in the future and whether Mr. and Ms. Mann would continue to use corporal punishment as they had in the past. Ultimately, the Juvenile Court found there was not a substantial risk of future serious physical harm, concluding that the court did "not find by a preponderance of the evidence that the allegations in the petition have been proved." The Juvenile Court thus dismissed HHSA's petition.

Subsequent to the Juvenile Court's dismissal of HHSA's petition, Mr. Mann demanded that HHSA withdraw its "substantiated" finding of child abuse from CACI. HHSA declined, stating Mr. Mann's proper recourse was to request an administrative hearing where he could present the reasons why the "substantiated" finding should be withdrawn.

On April 7, 2011, Mr. and Ms. Mann, N.G.P.M., M.N.A.M., N.E.H.M., and M.C.G.M. ("Plaintiffs") filed a complaint against the County of San Diego, HHSA, Polinsky, Cisneros, Quadros, Redmond, Ferro, Monge, Solis (all nine collectively, "Defendants"), and five other now dismissed defendants. (ECF No. 1.) Plaintiffs assert eight causes of action for: (1) assault; (2) battery; (3) false imprisonment; (4) violation of federal civil rights under 42 U.S.C. § 1983; (5) Monell claims related to

County policies; (6) intentional infliction of emotional distress; (7) violation of state civil rights under California Civil Code § 43; (8) violation of state civil rights under California Civil Code § 52.1.

Plaintiffs sue based on Defendants' representations and conduct during the investigation, including interviewing N.G.P.M. at school; omitting evidence in the Detention Report and Warrant Application that the parents complied with HHSA's requests during the investigation; the medical examinations at Polinsky without parental consent or presence; and Mr. Mann's continued inclusion on CACI as a substantiated abuser. Now the parties each move for summary judgment.

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322-23.

Where the party moving for summary judgment does not bear the burden of proof at trial, it may show that no genuine issue of material fact exists by demonstrating

"there is an absence of evidence to support the non-moving party's case." Id. at 325. The moving party is not required to produce evidence showing the absence of a genuine issue of material fact, nor is it required to offer evidence negating the moving party's claim. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 885 (1990); United Steelworkers v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989). "Rather, the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of judgment, as set forth in Rule 56(c), is satisfied." Lujan, 497 U.S. at 885 (quoting Celotex, 477 U.S. at 323). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (internal quotations omitted).

"Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). "The district court may limit its review to the documents submitted for purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court need not "scour the record in search of a genuine issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); see Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587.

Cross-motions for summary judgment do not necessarily permit the court to render judgment in favor of one side of the other. Starsky v. Williams, 512 F.2d 109, 112 (9th Cir. 1975). The Court must consider each motion separately "on its own merits" to determine whether any genuine issue of material fact exists. Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001); Starsky, 512 F.2d at 112. When evaluating cross-motions for summary judgment, the court must analyze whether the record demonstrates the existence of genuine issues of material fact, both in cases where both parties assert that no material factual issues exist, as well as where the parties dispute the facts. See Fair Housing Council of Riverside County, 249 F.3d at 1136 (citing Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 & n.5 (9th Cir. 2000)).

## II.    Defendants' Motion for Summary Judgment or Partial Summary Judgment

Defendants move for summary judgment on the following issues and claims: (1) qualified immunity bars Plaintiff's § 1983 claim; (2) the social workers properly obtained and executed the protective custody warrant; (3) absolute immunity bars Plaintiff's civil rights claims; (4) the medical examinations at Polinsky were authorized by court order and constitutional; (5) Mr. Mann was listed on CACI pursuant to state law; (6) the County's policies are not unconstitutional; (7) Defendants are entitled to statutory immunities and privileges; and (8) Plaintiff's false arrest[7] and Civil Code § 52.1 claims fail because there has been no constitutional violation; and (9) Plaintiff's claim for punitive damages fails because Plaintiff's can present no evidence of evil motive or intent.

### A.    Qualified Immunity

--------

[7] As Plaintiffs note, they have not asserted a claim for false arrest.

Plaintiffs claim, in their fourth cause of action, that Defendants violated Plaintiffs' First, Fourth, and Fourteenth Amendment rights. Defendants contend they are qualifiedly immune from such a claim.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Malley v. Briggs, 475 U.S. 335, 341 (1986). Thus, on summary judgment, a court "appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." Harlow, 457 U.S. at 818; see also Davis v. Scherer, 468 U.S. 183, 183 (1984) (holding that "[a] plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue").

"If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-19. But, "if the [government] official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." Id.; see also Anderson v. Creighton, 483 U.S. 635, 638 (1987) ("[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law." (quoting Malley, 475 U.S. at 341)).

In sum, "[w]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time the action was taken." Anderson, 483 U.S. at 635. That is, "[t]he relevant question . . . is the objective question whether a reasonable officer could have believed [the conduct at issue] to be lawful, in light of clearly

established law and the information the [officer who engaged in the conduct at issue] possessed." Id. at 636; see also Saucier v. Katz, 533 U.S. 194, 201 (2001) (setting forth two-step analysis for resolving government officials' qualified immunity claims); but see Pearson v. Callahan, 555 U.S. 223, 227 (2009) (holding that two-step Saucier analysis should not be regarded as an inflexible requirement, but that a court may consider the steps as the court deems appropriate in its discretion).

Defendants argue they are entitled to qualified immunity from Plaintiffs' civil rights claims to the extent they are based on Defendants' (1) the interview of N.G.P.M. at her school, (2) obtaining and executing the protective custody warrant, (3) examination of the children at Polinksy, and (4) listing of Mr. Mann on CACI.

### 1.    Interview of N.G.P.M. at School

Defendants assert it was not unconstitutional to interview N.G.P.M. pursuant to California Penal Code section 11174.3.

In Greene v. Camreta, the Ninth Circuit considered whether a social worker and sheriff deputy's interview of a minor child at school regarding child abuse allegations—without a warrant, court order, exigent circumstances, or parental consent—violated the Fourth Amendment right to be free from unreasonable seizures. 588 F.3d 1011, 1015 (9th Cir 2009) (subsequent history discussed infra).  The court held the seizure and interrogation of the minor was unconstitutional, but that the minor's right to be free from such a seizure was not clearly established at the time of its occurrence. Id. at 1030-33.  The court thus held the defendant officials were entitled to qualified immunity.  Id. at 1033.

The social worker petitioned the Supreme Court for review of the determination that the interrogation of the minor was unconstitutional. Camreta v. Greene, 131 S. Ct. 2020 (2011).  Finding the minor's constitutional claim was moot, the Supreme Court vacated the Ninth Circuit's holding that the seizure was unconstitutional, noting the social worker had been deprived of his right to challenge the Ninth Circuit's holding that he was required to obtain a warrant before interviewing a suspected child abuse

victim at school. Id. at 2035. The Supreme Court's vacatur of the Ninth Circuit's holding, thus "strip[ped] the decision below of its binding effect." Id. On remand, the Ninth Circuit vacated the portion of its opinion on the Fourth Amendment issue. Greene v. Camreta, 661 F.3d 1201, 1201-02 (9th Cir. 2011).

Plaintiff's assert that, notwithstanding the Supreme Court's vacatur of the Fourth Amendment portion of the Ninth Circuit's decision in Greene, Cisneros' interview of N.G.P.M. was unconstitutional. While the interview of N.G.P.M. may have been unconstitutional, the Court first addresses whether a right to be free from such interviews was clearly established at the time of the interview. In that regard, Plaintiffs provide no additional authority demonstrating that, at the time of the interview, it was clearly established that a social worker's brief, voluntary interview of a suspected child-abuse victim at school (with the option of having a school official present) violates the Constitution. Thus, the Court finds Defendants are entitled to qualified immunity as to the interview of N.G.P.M. at school.

## 2. Obtaining and Executing the Protective Custody Warrant

Defendants assert (1) the social workers' actions in obtaining and executing the protective custody warrant was not unconstitutional because the warrant was presumptively valid and, even if it were not valid, the social workers' good-faith reliance on the warrant was justified and therefore constitutional; and (2) Plaintiffs' claimed right to be free from judicial deception in juvenile court proceedings was not clearly established at the time the social workers obtained the warrant.

### a. Constitutional Violation

A warrant affidavit is presumptively valid. Franks v. Delaware, 438 U.S. 154, 171 (1978). To challenge a warrant affidavit, one "must show (1) the affidavit contains intentionally or recklessly false statements, and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause." United States v. Leftkowitz, 618 F.2d 1313, 1317 (9th Cir. 1980) (citing Franks, 438 U.S. 154). This analysis applies to omissions as well as affirmative misstatements. Leftkowitz, 618

F.2d at 1317 n.3.

Further, a judge-issued warrant "normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search," and thus a search pursuant to a warrant "will rarely require any deep inquiry into the reasonableness of the search." United States v. Leon, 468 U.S. 897, 922 (1984) (internal quotations omitted). But, an officer's reliance on a judge's probable-cause determination and on the technical sufficiency of the warrant  must be objectively reasonable. Id. at 923. Thus, a search based on a later invalidated warrant will still be unreasonable if the warrant was issued based on information that the warrant affiant "knew was false or would have known was false except for his disregard of the truth." Id. (citing Franks, 438 U.S. 154).

Defendants argue that, under the Franks analysis, Plaintiffs cannot overcome the presumptive validity of the Detention Report and Warrant Application based on the fact that Cisneros and Quadros omitted facts regarding the parents' compliance and cooperation with HHSA and Ms. Mann's complaints to Quadros and Ferro about Cisneros.  Defendants assert that Plaintiffs have offered no evidence demonstrating Cisneros and Quadros made any false statements or material omissions that were deliberately falsified or made in reckless disregard of the truth.  Defendants further assert that the Juvenile Court had notice that the parents were cooperating in some sense, as the Detention Report and Warrant Application contain several instances indicating the parents were cooperating with HHSA.  (See p. 8, supra.)

Plaintiffs argue in response that it does not matter that Cisneros and Quadros included instances of the parents' cooperation with HHSA.  Plaintiffs assert that what matters is that Cisneros and Quadros did not include all instances of the parents' cooperation, along with facts related to Ms. Mann's complaints to Quadros and Ferro. (See pp. 6-7, supra.)  Plaintiffs argue in their own motion for summary judgment that, had the Juvenile Court been presented with the excluded information regarding the parents' cooperation and Ms. Mann's complaints, that the Juvenile Court would not

have issued the protective custody warrant.

"[I]n applying the qualified immunity standard, the determination of whether the facts alleged could support a reasonable belief in the existence of probable cause is a question of law determined by the court." Carnell v. Grimm, 872 F. Supp. 746, 754 (D. Hawai'i 1994). The Court will thus undertake the Franks analysis to determine whether the protective custody warrant was valid.

The Court first notes there is no dispute regarding which facts were included or omitted in the Detention Report and Warrant Application. That said, this Court finds the omitted facts regarding the parents' cooperation and Ms. Mann's complaints about Cisneros were material to the Juvenile Court's decision to issue the protective custody warrant and should have been included. Had the Juvenile Court been aware, for example, that Ms. Mann offered to take her children to their pediatrician, and that both parents agreed to take N.E.H.M. and M.N.A.M. to Children's hospital, then it is very likely the Juvenile Court would have found Cisneros' claim that the parents were uncooperative to be unsubstantiated.

Further, the only instance of what could be considered hostility occurred on April 8, 2010, when Ms. Mann became upset and told Cisneros and Redmond to take the pictures of the bruise on M.N.A.M.'s forehead and leave. This Court would have found the complete phone message that Ms. Mann left for Quadros later that evening requesting to speak to Quadros about Ms. Mann's behavior toward Cisneros and Redmond, in addition to Ms. Mann's prior complaints regarding Cisneros' conduct (including Ferro's agreement to have Redmond accompany Cisneros to the Mann home), valuable in evaluating whether Ms. Mann was actually hostile toward HHSA personnel. Thus, as to the second prong of the Franks analysis, the Court finds that, had the omitted information been included, the Detention Report and Warrant Application would not have supported a finding of probable cause.

Thus, the question remains whether Cisneros and Quadros intentionally or recklessly falsified the Detention Report and Warrant Application. Plaintiffs assert the

social workers were retaliating against the parents for challenging their authority. Plaintiffs support this theory with the fact that, after Ms. Mann's complaints about Cisneros, HHSA surreptitiously prepared and filed the Detention Report and Warrant Application to remove the children from the home, in addition to the fact that Quadros and Cisneros removed exculpatory evidence from Detention Report and Warrant Application. Defendants, on the other hand, provide Cisneros' and Quadros' declarations indicating they did not misrepresent, fabricate, or conceal any facts in the Detention Report and Warrant Application.[8]

Genuine issues of fact remain and, as such, Defendants are not entitled to summary judgment on the issue of whether the protective custody warrant was presumptively valid.[9]

### b.    Clearly Established Right

Defendants further argue that Plaintiffs' federal right not to have deliberately fabricated evidence used in a civil juvenile proceeding was not clearly established, for purposes of qualified immunity, until December 2010—after the events in this case. Plaintiffs assert such a right was clearly established.

In <u>Costanish v. Department of Social and Health Services</u>, the plaintiff sued DSHS officials, claiming they violated her Fourteenth Amendment due process rights by depriving her of liberty and property interests in her foster care license and

---

[8] Plaintiffs' object globally to these declarations based on lack of personal knowledge. Plaintiffs specifically object to the social workers' statements that they did not misrepresent, fabricate, or conceal facts on grounds of lack of personal knowledge, inadmissible expert opinion, and lack of relevance. Plaintiffs' objections as to personal knowledge are overruled, as the social workers state in their declarations that they investigated the Mann case and prepared the Detention Report and Warrant Application. Plaintiffs' objection regarding expert opinion is overruled, as the social workers were not offering an opinion when they said they did not misrepresent, fabricate, or conceal facts. Plaintiffs' relevance objection is overruled, as the issue of whether the social workers misrepresented, fabricated, or concealed facts goes directly to the question of whether they deceived the Juvenile Court.

[9] Assuming the protective custody warrant was invalid, Defendants alternatively argue it was not unreasonable for the social workers to rely on the Juvenile Court's protective custody warrant. The good faith exception, however, does not apply where a warrant affiant offers evidence she "knew was false or would have known was false except for [her] disregard of the truth." <u>Leon</u>, 468 U.S. at 923. And, as discussed, whether Cisneros and Quadros intentionally or recklessly falsified the Detention Report and Warrant Application is disputed. Thus, Defendants are not entitled to summary judgment on this ground either.

dependency guardianship of two minors. 627 F.3d 1101, 1107 (9th Cir. 2010). The plaintiff claimed, among other things, that an investigator for DSHS fabricated evidence in her report and declaration submitted in connection with child abuse proceedings against the plaintiff.

In determining whether the defendants were entitled to qualified immunity, the Ninth Circuit first held that the fabrication of evidence against the plaintiff violated her Fourteenth Amendment due process right to be free from deliberately fabricated evidence in a civil child abuse proceeding. Id. at 1113-14. The Ninth Circuit went on to hold, however, that the right to be free from the deliberate fabrication of evidence in civil child abuse proceedings that results in the deprivation of a protected liberty or property interest "had not previously been clearly established in the civil context." Id. at 1114.

The court distinguished Devereaux v. Abbey, 263 F.3d 1070 (9th Cir. 2001), where the court held that intentionally fabricating evidence in criminal proceedings violates the Constitution, based on the difference between criminal and civil child abuse proceedings. Costanich, 627 F.3d at 1115. The Costanich court then concluded that, "going forward, reasonable government officials are on notice that deliberately falsifying evidence in a child abuse investigation and including false evidentiary statements in a supporting declaration violates constitutional rights where it results in the deprivation of liberty or property interests, be it in a criminal or civil proceeding." Id.

In Greene v. Camreta, 588 F.3d 1011, 1034 (9th Cir. 2009), a portion of which was vacated as moot, 131 S. Ct. 2020 (2011), the Ninth Circuit observed that the "right to be free from judicial deception in securing the removal order was clearly established [before December 2009]." "More specifically, the right to be free from deception in the presentation of evidence during protective custody proceedings was clearly established at the time [the defendant social worker] filed his affidavit with the Juvenile Court." 588 F.3d at 1035. This holding is at apparent odds with the

Costanich holding that the similar right to be free from fabrication and/or falsification of evidence in a civil proceeding was not clearly established until 2010. This Court, however, distinguishes the Costanich case from the Greene case in that the Costanish case addressed the intentional fabrication and falsification of documents submitted in civil child abuse proceedings, while the Greene case more specifically addressed the deception of a juvenile court in obtaining a protective custody order.

The Court thus finds this case is more akin to Greene. Accordingly, this Court finds that the Plaintiffs' claimed right to be free from judicial deception in obtaining a protective custody warrant from a juvenile court was clearly established at least as early as the Greene decision was issued in December 2009.

Defendants are therefore not entitled to qualified immunity at this juncture for their actions in obtaining and executing the protective custody warrant.

### 3. Polinsky Medical Examinations

#### a. Constitutional Violation

Defendants argue the Polinsky medical examinations conducted on April 13, 2010 were not unconstitutional or illegal because they were done pursuant to the Juvenile Court's General Order, which incorporates recommendations by the American Academy of Pediatrics, and because the parents consented to the examinations.

Relying on Darryl H. v. Coler, 801 F.2d 893, 894-95 (7th Cir. 1986), Defendants further argue the examinations were constitutional in light of the need to balance the privacy rights of children and their family with the government's obligation and responsibility to deal with the reality of child abuse in society. And, relying on N.G. v. Connecticut, 382 F.3d 225 (2d Cir. 2004), Defendants argue an obligation to conduct the examinations arise from three important interests, including the children's medical needs, preventing harm to other children in the facility in the form of contagious diseases, and protecting the institution in general as to the health of the staff or to establish baselines to protect against abuse allegations against the staff.

Plaintiffs rely on Wallis v. Spencer, 202 F.3d 1126 (9th Cir. 2000), Greene v.

<u>Camreta</u>, 588 F.3d 1011 (9th Cir. 2009), and <u>Parkes v. County of San Diego</u>, 345 F. Supp. 2d 1071 (S.D. Cal. 2004), to argue that the Polinsky medical examinations are unconstitutional because they are intrusive, done primarily for investigative purposes, done without parental consent, and exclude the non-offending parent from being present.

In <u>Wallis</u>, the Ninth Circuit held that it was unconstitutional for police officers to remove children from their parents and then subject them to investigatory medical examinations without first notifying parents and obtaining judicial approval. 202 F.3d at 1141. In <u>Wallis</u>, the examination "was performed in order to determine whether [the children] had been sexually abused." <u>Id.</u> at 1135. The examinations, conducted by a physician, "included internal body cavity examinations of the children, vaginal and anal." <u>Id.</u> The physician also photographed the inside and outside of the female child's vagina and rectum and the male child's rectum. <u>Id.</u> The female child was "very upset by the procedures and asked for her parents."

The <u>Wallis</u> court stated that, "[b]arring a reasonable concern that material physical evidence might dissipate . . . or that some urgent medical problem exists requiring immediate attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations." <u>Id.</u> at 1141. In reaching this conclusion, the court addressed the concerns of the County of San Diego, then amicus in <u>Wallis</u>, that the court's holding would conflict with California Welfare and Institutions Code § 324.5, which pertains to the medical examinations of children in protective custody. <u>Id.</u> at 1141 n.12. The Ninth Circuit observed it did not have the occasion to consider whether the requirements of its opinion in <u>Wallis</u> had an affect on § 324.5, but that there appeared to be no conflict between the two. <u>Id.</u>

The <u>Wallis</u> court further observed that "parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention," and that "children have a corresponding right to the love, comfort,

and reassurance of their parents while they are undergoing medical procedures, including examinations—particularly those . . . that are invasive or upsetting." Id. at 1142. As noted in Greene v. Camreta, however, Wallis "addressed the constitutionality of investigatory physical examinations outside their parents' presence." 588 F.3d at 1036 (emphasis added).

In Parkes, the district court found the same exams at issue here were "significantly intrusive." 345 F. Supp. 2d at 1071. The court further held that the County's interest in ensuring that children entering Polinsky were not in need of medical care and the County's interest in protecting other children from contagious diseases did not outweigh the intrusive nature of the medical examinations. Id. The court further found that the policy of not allowing non-offending parents to be present at the examination violated the liberty interests of both parents and children. Id. (citing Wallis, 202 F.3d at 1142).

Contrary to Parkes, this Court is not convinced that the examinations were unconstitutionally intrusive and, instead, finds this is a disputed issue that may require expert testimony to resolve. The Court takes the view that a visual inspection of external genitalia is far less invasive than, for example, an internal examination that includes taking internal and external pictures as in Wallis.

This Court further disagrees with Parkes to the extent that it held that the policy of not allowing non-offending parents to be present violated the liberty interests of both parents and children under Wallis. Unlike the examinations in Wallis, it is unclear whether the Mann children were particularly upset by the examinations and in need of their parents' care and comfort. On one hand, one of the triplets was uncooperative with the exam. But, on the other hand, the children did not report the examination to Ms. Mann until weeks later. The Court further recognizes the County has offered justifications for excluding parents from the exam, which include not knowing the extent to which a "non-offending" parents is involved in the allegations of abuse when children are first brought to Polinsky, the need to determine whether the children

require urgent medical attention, the need to protect other children from contagious diseases, and the need to get a health baseline for future treatment and to protect the institution from allegations of abuse. The Court thus finds there are disputed issues underlying whether the exclusion of a "non-offending" parent from the examination violates the constitution.

The Court further finds disputed factual issues exist as to whether the examinations were done primarily for investigatory purposes. Dr. Graff testified in her deposition that, when children are admitted on allegations of physical abuse, she looks for and documents signs of abuse. Dr. Graff also stated in her declaration that initial screenings were necessary to inform the physician of any urgent medical needs, to establish a baseline for medical treatment, and to protect other children in the facility. Further, the examinations took only ten to twenty minutes, and mostly involved an assessment of the children's general physical well-being (e.g., eyes, ears, nose/mouth/teeth, heart, lungs, etc.). Moreover, the examination form itself is entitled "Admission Physical Examination."

Lastly, there are disputed issues as to whether the parents consented to the Polinsky examinations, and if so, whether the examinations were within the consents given. Defendants offer evidence that the parents consented to the examinations, and Plaintiffs argue the parents' consents were coerced and occurred after the examinations were completed (though, the timing of the examinations and the parents' signing of the consent forms is unclear).

In sum, because there are disputed issue regarding whether the Polinsky examinations were overly intrusive, purely investigatory in nature, and done without the "non-offending" parent's presence, it is unclear whether the examinations were unconstitutional.

/ / /

**b.      Juvenile Court's General Order**

Defendants assert the Juvenile Court's General Order—which allowed

comprehensive health screenings, incorporated recommendations by the American Academy of Pediatrics, and was in place at the time of the children's examination—was in place at the time of the examinations. And, as such, any constitutional repercussions related to the lack of a court order authorizing the Polinsky examinations are negated.

Plaintiffs argue that, while the American Academy of Pediatrics' recommends "initial health screenings" for children entering foster care or protective custody, such a screening is different than the "comprehensive health screening" authorized by the Juvenile Court's General Order. Plaintiffs also assert that, when read with the Wallis and Greene decisions, the Academy of Pediatrics' recommendation that "birth parents be encouraged to be present at health care visits and participate in health care decisions" makes parental presence mandatory. Plaintiffs further argue that the General Order itself is constitutionally defective as a warrant because it is not based on a particularized finding of probable cause.

Here, unlike the Parkes case, there was a general order that applied to the children and that authorized the examinations at Polinsky. Plaintiffs have not offered any evidence that demonstrates the examinations of the children at Polinsky were outside of the scope of examinations authorized by the Juvenile Court's General Order. The Academy of Pediatrics' recommendation that an initial health screening be done states that a "[g]enital and anal examination of both sexes should be conducted."

Regarding Plaintiffs' argument that the General Order is a constitutionally defective warrant is based on their contention that the primary purpose of the exams was investigatory in nature. As discussed above, there are disputed issues as to whether the primary purpose of the exams was investigatory in nature. Thus, while the examinations may have been conducted pursuant to the Juvenile Court's General Order, it is unclear whether the General Order is constitutionally sound under the Fourth Amendment. See Indianapolis v. Edmond, 531 U.S. 32, 41-42 (2000) (holding that vehicle checkpoints contravened Fourth Amendment because their "primary

purpose" was to "uncover evidence of ordinary criminal wrongdoing"). Thus, the Court is unable to determine at this juncture whether the Juvenile Court's General Order constitutionally authorized the Polinsky examinations.

### c.      Clearly Established Right

Defendants argue they are entitled to qualified immunity because the right to be free from examinations such as those conducted at Polinsky has not been clearly established at the time the examinations were done.

Relying on <u>Parkes</u>, Plaintiffs contend it was clearly established that these particular examinations were unconstitutional. As noted above, however, this Court disagrees with the <u>Parkes</u> court's conclusion that the examinations were unconstitutional because, from this Court's perspective, there exist disputed issues of fact underlying the reasons the <u>Parkes</u> court found the examinations violated the plaintiffs' rights in that case. Further, a single district court opinion does not suffice to create a clearly established right. <u>Marsh v. County of San Diego</u>, 680 F.3d 1148, 1159 (9th Cir. 2012) ("[T]he opinions by a federal district court and an intermediate state court are insufficient to create a clearly established right.").

Relying on <u>Wallis</u>, Plaintiffs contend it is clearly established that the exclusion of "non-offending" parents from the exam violated both the parents' and children's rights. The Court finds, however, that the facts of this case vary significantly than those in <u>Wallis</u>, such that it cannot be said that a reasonable official would be on notice that the Polinsky examinations violated a clearly established right. The <u>Wallis</u> examinations were literally intrusive, including the internal examination and photographing of the children's genitalia and anuses. That was not the case here.

Plaintiffs have failed to provide authority establishing that the Polinsky examinations, including the exclusion of "non-offending" parents, violated a clearly established right. Defendants are therefore entitled to qualified immunity to the extent Plaintiffs' civil rights claims rest on the Polinsky examinations.

### 4.      Listing Mr. Mann on CACI

### a. Constitutional Violation

Plaintiffs assert Defendants have violated Mr. Mann's Fourteenth Amendment due process rights by refusing to remove him as a "substantiated" child abuser on CACI after the Juvenile Court dismissed HHSA's petition in July 2010.

Defendants assert Mr. Mann is listed on CACI as a "substantiated" child abuser pursuant to state law. More specifically, Defendants argue the "substantiated" finding was done pursuant to California Penal Code § 11165.4, which provides that "'unlawful corporal punishment or injury' means a situation where any person willfully inflicts upon any child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition."

In Humphries v. Los Angeles County, 554 F.3d 1170 (9th Cir. 2009), rev'd in part on other grounds, 131 S. Ct. 447 (2010), the Ninth Circuit found the erroneous listing of parents who were accused of child abuse but later found to be factually innocent violated the parents' due process rights. The Ninth Circuit specifically found that "[t]he lack of any meaningful, guaranteed procedural safeguards before the initial placement on CACI combined with the lack of any effective process for removal from CACI violates the [parents'] due process rights." 554 F.3d at 1200. The court went on to state that, at the very least, "California must promptly notify a suspected child abuser that his name is on the CACI and provide 'some kind of hearing' by which he can challenge his inclusion." Id. at 1201.

On remand, the district court in Humphries found that collateral estoppel precluded the defendant county from denying that the substantiated finding rested on false allegations given the subsequent juvenile court finding that the county's allegations were "not true." Humphries v. Los Angeles County, 8:03-cv-0697-JVS-MAN, at 13 (C.D. Cal. Oct. 17, 2012) (unreported). The juvenile court in Humphries found that none of the allegations in the defendant county's petition were true. See id. at 10-11. After the Humphries case, California amended the Reporting Act to provide for a hearing process. See Cal. Penal Code § 11169(d).

This case is distinguishable from the <u>Humphries</u> case because, unlike the juvenile court in <u>Humphries</u> that found none of the allegations in the county's petition were true, the Juvenile Court here <u>did</u> find that Mr. Mann inflicted a physical injury in administering excessive discipline.  A reading of the Juvenile Court transcript reveals its decision to dismiss HHSA's petition rested on its finding that the children were not subject to <u>future</u> substantial harm.

To the extent California provides a hearing for the removal of his name from CACI, as required by the Ninth Circuit in <u>Humphries</u>, Mr. Mann's due process rights have not been violated.  California Penal Code § 11169(d) provides for such a hearing. There, Mr. Mann can appropriately dispute the factual appropriateness of his continued listing on CACI pursuant to California Penal Code § 11165.4.  For purposes of qualified immunity, however, Mr. Mann has not demonstrated a violation of his due process rights.

### b.    Clearly Established Right

Plaintiffs have failed to demonstrate the existence of a clearly established constitutional right to the withdrawal of a "substantiated" child abuse finding in light of a juvenile court's finding that, while a parent did inflict a physical injury in administering excessive discipline, the children were not at future risk of substantial harm.  Thus, Defendants are entitled to qualified immunity to the extent Plaintiffs' civil rights claims rest on Defendants' refusal to withdraw their substantiated finding of abuse.

In sum, Defendants' are qualifiedly immune from Plaintiffs civil rights claims to the extent they rest on (1) the interview of N.G.P.M. at school, (2) the Polinsky examinations, and (3) the listing of Mr. Mann on CACI as a "substantiated" child abuser.  The Court finds there are disputed issues underlying Defendants' claim of qualified immunity as to the obtaining and execution of the protective custody warrant.

### B.    Absolute Immunity

Defendants argue the social workers are entitled to absolute immunity from

Plaintiffs' civil rights claims because they were witnesses who testified in judicial proceedings. Defendants further argue the social workers are entitled to absolute immunity from Plaintiffs' civil rights claims because were acting in a prosecutorial capacity.

The Court rejects both of these arguments because neither witness nor prosecutorial immunity apply when there are allegations that a social worker made misrepresentations or was otherwise deceptive in testifying or instituting prosecutorial proceedings. See Cunningham v. Gates, 229 F.3d 1271, 1291 (9th Cir. 2000); Beltran v. Santa Clara County, 514 F.3d 906, 908-09 (9th Cir. 2008). As discussed above, there are disputed issues as to whether the social workers deliberately or recklessly excluded exculpatory facts from the Detention Report and Warrant Application. Accordingly, Defendants are not entitled to absolute immunity on these grounds.

### C.    Monell Claims

Plaintiffs claim the following County policies violate the constitution: (1) coercing parents into signing safety plans; (2) detaining and/or removing children without exigent circumstances; (3) using false and misleading information to obtain protective custody warrants; (4) detaining and/or removing children without determining whether the scope of the intrusion is reasonably necessary to avert the specific injury; (5) continuing to detain and/or remove children beyond a reasonable time after the basis for detention and/or removal has been negated; (6) requiring medical examinations without the knowledge, consent, or presence of parents, exigency, medical need, or a court order; (7) acting with deliberate indifference through inadequate training; (8) reporting parents as child abusers on CACI after a court has found allegations of abuse untrue.

A county's unlawful policies can result in § 1983 liability if the policies caused a violation of a constitutional right. Monell v. New York City Dept. Soc. Serv., 436 U.S. 658, 694 (1978). To prevail on a Monell claim, a plaintiff must establish that: (1) the plaintiff possessed a constitutional right of which he was deprived; (2) the

municipality had a policy; (3) the policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the policy is the moving force behind the constitutional violation. Van Ort v. Estate of Stanewich, 92 F.3d 831, 836 (9th Cir. 1996).

Defendants argue they are entitled to summary judgment on Plaintiffs' Monell related claims (fifth cause of action) because Plaintiffs have failed to demonstrate that any of the County's alleged policies violated the constitution.

Plaintiffs argue in response that it has established constitutional violations with respect to: (1) the Polinsky examinations, including the exclusion of non-offending parents; (2) the County's CACI policy; and (3) the de facto policy of excluding exculpatory evidence in court filings.

Plaintiffs do not argue that any of the other alleged policies violated their constitutional rights; Defendant is therefore entitled to summary judgment on whether these other alleged policies deprived Plaintiffs' of their constitutional rights.

Further, as discussed above, the Court has found that disputed issues exist as to whether Plaintiffs' rights were violated by the omission of exculpatory evidence of the Detention Report and Warrant Application. The Court has further found there are disputed issues as to whether the Polinsky examinations were unconstitutional. Lastly, the Court has found that Mr. Mann has not suffered a violation of his due process rights by the County's refusal to withdraw its finding of "substantiated" abuse. Accordingly, Defendants are not entitled to summary judgment on Plaintiffs' Monell claims based on the Polinsky examinations or the obtaining and execution of the protective custody warrant.

### C.    Statutory Privileges

Defendants argue they are entitled to the statutory privileges contained in California Government Code §§ 821.6 and 820.2 and in California Civil Code § 47.

Government Code § 821.6 provides: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding

31

within the scope of his employment, even if he acts maliciously and without probable cause."

Government Code § 820.2 provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

Civil Code §§ 47(a) and (b) provide that a communication is privileged if it is one made "[i]n the proper discharge of an official duty," or one made "[i]n any . . . judicial proceeding."

Plaintiffs do not argue that any of the above privileges are inapplicable. Plaintiffs instead argue that any such statutory privileges are overcome by California Government Code § 820.21, which provides:

> (a) Notwithstanding any other provision of law, the civil immunity of juvenile court social workers, child protection workers, and other public employees authorized to initiate or conduct investigations or proceedings pursuant to [the Welfare and Institutions Code] shall not extent to any of the following, if committed with malice:
>
> (1) Perjury.
>
> (2) Fabrication of Evidence.
>
> (3) Failure to disclose known exculpatory evidence.
>
> (4) Obtaining testimony by duress . . . .
>
> (b) . . . "malice" means conduct that is intended by the person described in subdivision (a) to cause injury to the plaintiff or despicable conduct that is carried on by the person described in subdivision (a) with a willful and conscious disregard of the rights or safety of others.

Given Defendants' admission that the Cisneros and Quadros failed to disclose known exculpatory evidence to the Juvenile Court in connection with obtaining the protective custody warrant, the Court agrees with Plaintiffs that Government Code § 820.21's provision that "[n]otwithstanding any other provision of law" means that Defendants are not statutorily immune under Government Code §§ 821.6, 820.2 or Civil Code § 47 to the extent the social workers acted with malice.

32

As addressed above, however, Plaintiffs claim, and Defendants dispute, that the social workers were retaliating against Plaintiffs for challenging the social workers' authority. Retaliation, of course, implies intentional conduct meant to harm another for purposes of revenge. The Court thus finds that disputed issues exist as to whether Government Code § 820.21 overcomes the statutory immunities afforded by Government Code §§ 821.6, 820.2 and in Civil Code § 47.

### D.    False Arrest and California Civil Code § 52.1

Defendants argue they are entitled to summary judgment on Plaintiffs' false arrest claim because probable cause has been established as set forth herein. Defendants further argue they are entitled to Plaintiffs' Civil Code § 52.1 claim because Plaintiffs have failed to establish an underlying constitutional violation.[10]

Plaintiffs first note they have not asserted a false arrest claim, but have instead asserted a false imprisonment claim (third cause of action). As to their Civil Code § 52.1 claim, Plaintiffs assert they have established constitutional violations as set forth herein.

The Court first finds Defendants have failed to explain why they are entitled to summary judgment with regard to Plaintiffs' false imprisonment claim based on a finding of probable cause. Accordingly, the Court denies Defendants' motion in this regard.

---

[10] Civil Code § 52.1 provides in part:

 (a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief . . .

(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured.

Further, the Court agrees with Defendants that Civil Code § 52.1 is an enabling statute and does not confer any substantive rights, but instead allows a party to recover damages if they can demonstrate their state or federal constitutional rights have been violated.  See Reynolds v. County of San Diego, 84 F.3d 1162, 1170 (9th Cir. 1996), overruled on other grounds by Acri v. Varian Assocs., 114 F.3d 999 (9th Cir. 1997). Because there are disputed issues as to whether Plaintiffs' constitutional rights were violated, however, the Court finds it inappropriate at this juncture to grant Defendants' motion as Plaintiffs' § 52.1 claim.

### E.    Punitive Damages

Defendants argue they are entitled to summary judgment on Plaintiffs' prayer for punitive damages because Plaintiffs can offer no evidence that Defendants were motivated by evil motive or intent, or were recklessly or callously indifferent to Plaintiffs' federally protected rights.

The Supreme Court has held that, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Smith v. Wade, 461 U.S. 30, 56 (1983).

As discussed above, there are disputed issues with regard to Plaintiffs' claim that Defendants retaliated against them.  Whether Defendants were retaliating against Plaintiffs is relevant to whether Defendants were motivated by evil motive or intent, or whether they acted in reckless disregard to Plaintiffs' federally protected rights. Thus, Defendants are not entitled to summary judgment on this issue.

### III.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for summary judgment on the following issues: (1) Cisneros and Quadros deceived the Juvenile Court in obtaining the protective custody warrant; (2) the medical examinations at Polinsky violated Plaintiffs' constitutional rights; (3) the County's policy of excluding non-offending parents from the medical examinations violated Plaintiffs' constitutional rights; and (4) the County violated Mr. Mann's due

process rights be refusing to withdraw its "substantiated" finding of abuse after the Juvenile Court petition was dismissed.

### A.    Judicial Deception

"'To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause.'" Greene, 588 F.3d at 1035 (quoting KRL v. Moore, 384 F.3d 1105, 1117 (9th Cir. 2004). "Whether a false statement was 'material' to the finding of probable cause is a question of law for the reviewing court." Greene, 588 F.3d at 1035.

As discussed above, the Court finds Cisneros and Quadors omitted material facts in the Detention Report and Warrant Application. Again, however, whether Cisneros and Quadros deliberately or recklessly made the omissions and representations in the Detention Report and Warrant Application is disputed. Thus, Plaintiffs are not entitled to summary judgment on the issue of judicial deception.

### B.    Polinsky Examinations

Relying on Parkes, Wallis, and Greene, Plaintiffs argue the Polinsky examinations were unconstitutional because they were overly intrusive and done purely for investigatory reasons, without parental consent, without court order, and without the presence of the "non-offending" parent.

As discussed above, however, the Court finds that, because there are disputed issue regarding whether the Polinsky examinations were overly intrusive or purely investigatory in nature, it is unclear whether the examinations themselves were unconstitutional. Also as discussed above, the Court finds disputed issues exist as to whether the County is justified in its policy of excluding "non-offending" parents. Accordingly, Plaintiffs are not entitled to summary judgment on the issue of whether the examinations themselves were unconstitutional nor on the issue of whether excluding the "non-offending" parent from the examinations was unconstitutional.

3:11-cv-0708-GPC-BGS

**C.     Mr. Mann's Listing on CACI**

Plaintiffs argue Defendants violated Mr. Mann's due process rights be refusing to withdraw the "substantiated" finding of abuse after the Juvenile Court petition was dismissed.   As discussed above, however, state law provides Mr. Mann with due process in the form of a hearing under Penal Code § 11169(d).   Thus, Plaintiffs' are not entitled to summary judgment on this issue.

## CONCLUSION AND ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1.     Defendants' motion for summary judgment, (ECF No. 77) is **GRANTED IN PART** and **DENIED IN PART**;

2.     Plaintiffs' motion for summary judgment, (ECF No. 80), is **DENIED**;[11]

3.     The hearing on the parties' motions, currently set for August 9, 2013, is **VACATED**.

DATED:  August 8, 2013

HON. GONZALO P. CURIEL
United States District Judge

---

[11] Plaintiffs makes several objections to the evidence offered by Defendants and vice versa. To the extent that the Court does not rely on the evidence objected to by either party, said objections are overruled as moot.