1
Donnie R. Cox, Esq. SBN: 137950
LAW OFFICE OF DONNIE R. COX
2
402 N. Nevada Street
Oceanside, CA 92054
3
(760) 400-0263
drc@drcoxlaw.com
4

5
Paul W. Leehey, Esq. SBN: 92009
LAW OFFICE OF PAUL W. LEEHEY
6
210 E. Fig St., Suite 101
Fallbrook, CA  92028
7
(760) 723-0711
law@leehey.com

8
Robert Hamparyan, Esq., SBN: 181934
LAW OFFICES OF ROBERT HAMPARYAN
9
275 West Market Street
San Diego, CA 92101
10
Tel: 619-550-1355
Fax: 619-550-1356
11
robert@hamparyanlawfirm.com

12
ATTORNEYS FOR PLAINTIFFS

13

14
**UNITED STATES DISTRICT COURT**

15
**SOUTHERN DISTRICT OF CALIFORNIA**

16
| | |
|---|---|
| MARK MANN; MELISSA MANN; N.G.P.M., a Minor; M,N.A.M., a Minor; M.C.G.M, a Minor; and N.E.H.M., a minor – by and through their Guardian ad litem, Bruce Paul, | No. 11cv0708-GPC(BGS) |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED**

                    Plaintiffs,

        v.

COUNTY OF SAN DIEGO; et al,

                    Defendants.

**Motion Date:  August 7, 2015**
**Time:  1:30 p.m.**
**Courtroom 2D**

**Honorable Gonzalo P. Curiel**
**Trial Date:  None Set**

# TABLE OF CONTENTS

I.      Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.     Factual background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

        A.      Introductory Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      The PCC Medical Exams of the Mann Children. . . . . . . . . . . . . . . . 2

                1.      Initial Nursing Evaluation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                2.      The Physical Examination. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                3.      County Policies Concerning PCC Exam. . . . . . . . . . . . . . . . . 4

                4.      The "Consent Forms" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

IV.     AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

        A.      Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      Facial Challenge vs. "As-Applied" Challenge. . . . . . . . . . . . . . . . . .9

        C.      Authority Supporting Plaintiffs' Challenge to County's Policies. . . . .10

                1.      Wallis v. Spencer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

                2.      Parkes v. County of San Diego. . . . . . . . . . . . . . . . . . . . . . . 12

                3.      Greene v. Camreta. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

                4.      Swartwood v. County of San Diego. . . . . . . . . . . . . . . . . . . . 13

        D.      County's Policy of Preventing Parents From Attending Their Child's

        Medical Procedures Including Examinations. . . . . . . . . . . . . . . . . . . . . . . . 14

                1.      The Medical Procedures, Including Examinations, Are

                        Unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                2.      County Has Stated No Valid Reasons For Excluding Parents From

                        The Exams. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

        E.      Lack of Parental Notice and Consent. . . . . . . . . . . . . . . . . . . . . . . . . 19

                1.      The PCC Exams Are Not Authorized By Law. . . . . . . . . . . . . 20

                2.      The County's "Consent" Form Does Not Constitute Informed

                        Consent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1

F.      The Authority Cited By Defendant Is Inapplicable. . . . . . . . . . . . . . . .23

2

V.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**U.S. CONSTITUTIONAL AMENDMENTS**

Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 14, 25

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 14, 15, 19, 25

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . 8, 9

*Carmen v. San Francisco Sch. Dist.*, 273 F.3d 1026 (9th Cir. 2001) . . . . . . . . . . . . 9

*Chew v. Gates,* 27 F.3d 1432(9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*Darryl H. v. Coler,*801 F.2d 893 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Dubbs v. Head Start, Inc.*, 366 F.3d 1194 (10th Cir. 2003) . . . . . . . . . . . . . . . 22, 23

*Fidelity Nat. Financial, Inc. v. Friedman,*855 F.Supp.2d948(D. Arizona 2012) . . .23

*Galen v. County of Los Angeles,* 477 F.3d 652 (9th Cir. 2007) . . . . . . . . . . . . . . .9

*Greene v. Camreta,* 588 F.3d 1011 (9th Cir. 2009) . . .1, 10, 12, 13, 14, 15, 16, 17, 18

*Greene v. Camreta,* 661 F.3d 1201 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . .10

*Keenan v. Allan,* 91 F.3d 1275(9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Mastrobuono v. Shearson Lehman Hutton, Inc.,*514 U.S. 52 (1995) . . . . . . . . . . . 23

*Monell v. Department of Social Services of City of New York,*
436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 10, 12

*Mueller v. Auker,*576 F.3d 979 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*N.G. v. Connecticut ,*382 F.3d 255 (2nd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 23

*Parkes v. County of San Diego,* 345 F.Suppl 1072
(SD Cal.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 12, 14, 15, 18, 20

*Safford Unified School District No. 1 v. Redding*, 557 U.S. 364,
129 S Ct. 2633 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Smook v. Minnehaha County,*457 F.3d 806 (8th Cir. 2006) . . . . . . . . . . . . . . . . . 23

*Swartwood v. County of San Diego, 2014 WL 7778999*
*(SD Cal.2014).* . . . . . . . . . . . . . . . . . . . . . 7, 10, 13, 14, 15, 16, 17, 18, 19, 22, 23

*Tenenbaum v. Willams*, 907 F.Supp. 606 (EDNY 1995) . . . . . . . . . . . . . . . . . . . 21

1 | *Tobe v. City of Santa Ana,* 9 Cal.4[th] 1069 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

2 | *T.W. Elec. Serv.,Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626

3 | (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

4 | *Wallis v. Spencer,* 202 F.3d 1126 (9th Circ. 1999). . .1, 10, 11, 13, 14, 15, 16, 17, 20, 21

5 | **FEDERAL RULES OF CIVIL PROCEDURE**

6 | FRCP 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

7 | FRCP 56(c) (1)(A)-(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8 | **UNITED STATES CODE**

9 | 42 USC Section 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

10 | **WELFARE AND INSTITUTIONS CODE**

11 | Section 324.5. . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . 14, 20, 21

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Mark Mann, Melissa Mann, and NGPM, MNAM, MCGM, and NEHM, minors, by and through their Guardian ad Litem, Bruce Paul, respectfully submit the following Memorandum of Points and Authorities in support of their Motion for Partial Summary Judgment or, in the alternative for Order Treating Specified Facts as Established:

# I. <u>INTRODUCTION</u>

"[I]n the area of child abuse, as with the investigation and prosecution of all crimes, the state is constrained by the substantive and procedural guarantees of the Constitution. . . [G]overnmental failure to abide by constitutional constraints may have deleterious long-term consequences for the child and, indeed, for the entire family. Ill-considered and improper governmental action may create significant injury where no problem of any kind previously existed." *Wallis v. Spencer*, 202 F.3d 1126, 1130-1131 (9th Cir.1999)

Plaintiffs challenge Defendant County of San Diego's policy of conducting medical examinations on <u>*all children*</u> entering its Polinsky Children's Center ("PCC") on two grounds: (1) the policy precludes parents from attending the medical exam; and (2) the examination is performed without parental notice or consent, without a court order regarding the specific child and in the absence of exigency. Plaintiffs further contend that the County's policy was the moving force in violating the Mann children's Fourth Amendment rights and the Mann family's Fourteenth Amendment rights.

There are no material facts in dispute concerning the constitutionality of the PCC exams.[1] Defendants have not shown any valid basis for their violation of the fundamental guarantees of the United States Constitution. "In the name of saving children from the harm that their parents and guardians are thought to pose, states ultimately cause more harm to many children than they ever help." *Greene v. Camreta*. 588 F.3d 1011, 1016 (9th Cir.2009).

---

[1] See Document 135 filed in this matter wherein Defendants acknowledge that "(T)he issue of whether the Polinsky exams are lawful is a legal issue, not a factual one. There are no disputes about how the exams were conducted, or who conducted them, or whether the parents were present. The only question is whether the exams were lawful; this question should be decided by the court."

## II. FACTUAL BACKGROUND

### A.   Introductory Statement

Both Plaintiffs and Defendants previously provided full factual backgrounds, with supporting evidence, in their August 2013 motions for summary judgment. In the interest of brevity, Plaintiffs refer the Court to those motions (Documents 80-1 and 77-1).[2] Plaintiffs will summarize only the facts upon which this motion is based.

This case arises out of the County's removal of the Mann Children from their home. The incident which caused the County to remove the Mann Children was Mark Mann's misplaced swat intended for the buttocks of one of his 2-year-old triplets. The swat left a red mark on his daughter's lower back.

### B.   The PCC Medical Exams of the Mann Children

#### 1.   Initial Nursing Evaluation

Upon their arrival at PCC, a nurse took the Mann Children's vital signs, and performed a cursory evaluation, for matters such as lice or fever, and to determine if any health issues existed. (SSUF1)  In addition, urine samples were taken of all the children even though there were no allegations of drug use or exposure. (SSUF 2) The children were then admitted to PCC, where they were released to the general population. (SSUF 3)

#### 2.   The Physical Examination

In its June 5, 2015 Scheduling Order, this Court stated: "Dr. Nancy Graff, M.D., the examiner of the Mann children, testified in her deposition that she was unsure as to whether the Mann children were given a genital examination and nobody told her that the children had been touched in their genitals or anus, which would have occurred in a genital or rectal exam. (ECF No. 80-14, Ex.9, at 27:12-28:21)." In the referenced testimony, Dr. Graff stated that she didn't recall anybody telling her, after the fact, that one of the children indicated she had been touched in her private parts. (SSUF 4). However, as referenced more fully below, Dr. Graff 's testimony is that the physical examinations she conducted in 2010, including the examination of the genitals, was

---

[2] Plaintiffs incorporate by reference herein their previously submitted and filed arguments and supporting evidence on these same PCC issues at Doc 80, 80-1 to 21, 82; 97, 97-1 to 4; 100, 100-1to 3; and 161 in the Court file in this matter.

exactly the same as she had described it in her deposition in 2002 in the *Parkes v. County of San Diego* case, and that a child would be touched in their private parts during the genital examination. (SSUF 5).

Dr. Graff also testified that even though she did not specifically remember conducting the physical examinations on the Mann children, their examinations would be consistent with the physical examination she gives to all children which included the external genitalia (SSUF 6). She further acknowledges that the exam of NGPM would have included the external genitalia, as well as whatever else was "checked off" on the Admission Physical Examination form (SSUF 8).

Consistent with this testimony and PCC's Admission Physical Examination for each Mann child, on April 13, 2010, between approximately 8:40 a.m. and 11:00 a.m., Dr. Nancy Graff performed physical examinations on each of the Mann Children. (SSUF 7) The examinations included a full pediatric physical examination, that involved an examination of the child's external genitalia and rectum (i.e. private parts), and included any of the other 22 physical examination "items" that were "checked off" on the child's Polinsky Children's Center Admissions Physical Examination form; which necessarily required the children to undress.  (SSUF 8)

To perform the genital exam, Dr. Graff would ask the children to drop their legs into a frog leg situation. For girls, she would separate the labia with her fingers to look at the hymen. (SSUF 9) Dr. Graff touched the children's private parts during the genitalia exam, including the vagina and the anus. (SSUF 10)

PCC's records confirm that 6-year-old NGPM was subjected to a vaginal examination, MCGM's exam included a vaginal and anal exam, but examination of her hymen was "deferred." (SSUF 11) The doctor could not perform the vaginal and anal exam on NEHM because she was "too squirmy." MNAM's exam included inspecting his penis and anus. (SSUF 11)

In addition the children were each subjected to blood tests, which included a skin test for tuberculosis, a lab test (consisting of a subdermal injection) and an HGB test, in which blood was taken from the child's finger. (SSUF 12)

The Mann Parents were not aware of and not present for these medical procedures, and did not provide consent for them before they were performed. (SSUF 13) Dr. Graff has asserted that she tried to call Melissa Mann on the morning of April 13 to obtain a medical history for the children, but was not calling Ms. Mann to obtain consent. "I do the medical exam regardless of whether or not there's a history." (SSUF 14)

3.   <u>County Policies Concerning PCC Exams</u>

Dr. Nancy Graff, who performed the physical examinations on the Mann Children, was the medical director of the medical unit at PCC from October 1994 until December 2011 (SSUF 15).

Dr. Graff testified that the medical examinations she performed at PCC were authorized by a Juvenile Court general order under a contract with the County. (SSUF 16)

Dr. Graff closely examined all children brought to PCC for any evidence of physical or sexual abuse. (SSUF 17) In this examination, she is looking for "obvious findings that might suggest that they have been" abused, and is attempting to investigate whether or not child abuse or neglect did, in fact, occur. (SSUF 18) It is her understanding that this investigation is in accordance with the policies and procedures of the County of San Diego. (SSUF 19) Dr. Graff would document and photograph any signs of physical abuse. (SSUF 20)

This examination included an examination of the genitalia to look for obvious findings that might suggest the children were sexually abused. (SSUF 21) **<u>The genitalia/hymen exam was to be performed on all children entering PCC.</u>** (SSUF 22) It was required by the contract with the County. (SSUF 22)

Although the County claims that the entire purpose of the physical examination was to establish a foundation for the health status of the child—a baseline—Dr. Graff testified that she is "looking for" possible medical problems, abuse, neglect and other types of conditions (SSUF 23)

In addition to the physical examination, **blood tests were also performed on all children entering PCC for the first time. (**SSUF 24**).** These included a skin test for

tuberculosis, a lab test (consisting of a subdermal injection) and an HGB test, in which blood was taken from the child's finger. (SSUF 24) *For children coming to PCC with allegations of physical abuse, urine drug screens were performed to look for drug exposure* (SSUF 24)

Under County policy, parental consent was not needed to conduct these physical examinations. (SSUF 25) Instead, Dr. Graff conducted the exams pursuant to a general order from the Presiding Judge of the Juvenile Court that says that children can have an examination performed by a licensed physician prior to detention. (SSUF 26) Nor were parents notified that their children would be physically examined. (SSUF 27)

In addition, the policy at PCC during Dr. Graff's tenure *barred parents from attending the medical examinations of their children.* (SSUF 28) **All parents** were barred from attending the medical examinations, even if they were non-offending. (SSUF 29)

### 4.   The "Consent" Forms

On the morning of April 13, 2010, the same morning as the Mann Children were being examined at PCC, the Mann Parents were at the detention hearing at Juvenile Court. *After* the detention hearing, the Mann Parents were told that they needed to sign several forms before they could see their children. (SSUF 30) These forms included consent for HHSA to administer "medical, developmental, dental, and mental health care" while their children were at PCC, "if the treatment *is recommended* by a licensed physician, dentist, psychiatrist or other mental health practitioner." (SSUF 31) The consent forms further stated that "[m]edical  . . . *care* can include: Routine admission and placement examinations, including blood test, immunization, cervical cultures *(when indicated)* . . . X-ray examination, local anesthesia, medical or psychiatric diagnosis or treatment by a licensed physician." (SSUF 31) The form signed by the Mann Parents states that they prefer treatment by private physician, and named Janna Cataldo as the preferred physician. (SSUF 31)  *Nowhere on this form is the parent informed that he or she may be present during their child's medical procedures*.

///

///

### III. Procedural Background

This action was filed on April 7, 2011. Plaintiffs asserted 8 causes of action, only one of which is pertinent to this motion: Plaintiffs' Fifth Cause of Action for *Monell* claims based on the County's policies, procedures, practices and/or customs (hereinafter "policies"). This motion only addresses the County's policies concerning examinations performed at PCC.

In April 22, 2013, both parties brought motions for summary judgment/partial summary judgment. In their motion, Plaintiffs claimed that the County's policies concerning physical examinations at PCC caused the constitutional rights of the Mann Family to be violated due to the County's policy of conducting medical exams at PCC, including examinations of the children's external genitalia, without court order or parental consent. Plaintiffs also claimed that their constitutional rights were violated due to the County's policy barring parents from attending their children's physical exams at PCC. Defendants claimed that the exams were specifically authorized by a 2007 Juvenile Court Order, were required by statute, and that the Plaintiffs' right to familial association was outweighed by the medical needs of the children entering PCC, the need to prevent harm to other children at PCC; and the need to protect the institution and its employees. In their opposition to Plaintiffs' motion, Defendants also claimed that the Mann Parents consented to the PCC examinations.

On August 8, 2013 (Document 190), this Court entered its order on the parties' summary judgment motion. With respect to the PCC exams, the Court focused on 3 issues:

1) Whether the exams were unconstitutional in light of the Juvenile Court's General Order.[3]

2) Whether the Mann Parents consented to the exams.

3) Whether the government's "obligation and responsibility to deal with the reality of child abuse in society" outweighed constitutional rights to familial association and privacy. Specifically, the court focused on the County's claimed interest in the Mann

---

[3] The Court held that if the primary purpose of the exams was investigatory in nature, the Order authorizing the exams was a constitutionally defective warrant.

Children's medical needs, preventing harm to other children in the facility in the form of contagious diseases, and protecting the institution in general.

In its order, the court highlighted the following issues it believed were in dispute:

- Whether the examinations were unconstitutionally intrusive. The Court pondered whether a visual inspection of the external genitalia is "invasive", and whether "the Mann children were particularly upset by the examination and in need of their parents' care and comfort."

- Whether there were valid justifications for excluding parents from the exam, including "not knowing the extent to which 'non-offending' parents is involved in the allegations of abuse when children are first brought to Polinsky, the need to determine whether the children require urgent medical attention, the need to protect other children from contagious diseases, and the need to get a health baseline for future treatment and to protect the institution from allegations of abuse."

- Whether the examinations were done primarily for investigative purposes.

- Whether the parents consented to the exams, and, if so, whether the examinations were within the consent given.

On July 25, 2014, Defendants filed an ex parte request to bring a second summary judgment motion on the issue of the County's policies and practices in conducting medical examinations at PCC. In this application, Defendants' counsel stated: "The issue of whether the Polinsky exams are lawful is a legal issue, not a factual one. There are no disputes about how the exams were conducted, or who conducted them, or whether the parents were present. The only question is whether the exams were lawful; this question should be decided by the Court." (Document 135) Defendants' application was denied.

On March 6, 2015, Plaintiffs, also, requested that the Court reconsider its prior summary judgment order on the *Monell* claim in a Motion in Limine. The basis of Plaintiff's request for reconsideration was a recent order issued by Judge Thomas Whelan in *Swartwood v. County of San Diego*, 2014 WL 7778999 (SD Cal.2014).[4]

---

[4] Judge Whelan's decision on the issue of the Polinsky exams became a final judgment of the court on March 24, 2015 (*Swartwood v. County*, USDC Southern District Case 12cv01665, Document

As a result of this and other issues raised by motions in limine, the Court requested that the parties provide statements of any outstanding legal issues. These statements were filed on April 17, 2015. Plaintiffs identified the following issues germane to this motion:

- The constitutionality of County's policy at PCC of excluding parents from being present while their child is receiving medical attention.
- The constitutionality of County's policy that all children admitted to PCC receive a medical exam regardless of parental consent, valid court order, or exigency.
- The examination was not lawfully authorized by the 2007 General Order or Welfare & Institutions Code §324.5.
- That the County's "Consent for Treatment-Parent" form does not lawfully provide notice (informed consent) to the parents that they are authorizing the County's examination of their child.

In their Statement, Defendants identified 5 discrete <u>factual</u> issues which they claimed had to be resolved by the jury: 1) whether the Mann Parents consented to the exams; 2) whether the exams were "unnecessarily" intrusive or invasive; 3) whether the exams are primarily for investigative purposes; 4) whether the County has valid reasons to exclude parents from the exams; and 5) whether the exams are authorized by the Juvenile Court's standing order.

Following its review of the parties' statements, the Court entered an order on June 5, 2015 requesting renewed briefing on the issue of the *Monell* cause of action regarding the PCC exams.

## IV. <u>AUTHORITY</u>

### A.  <u>Legal Standard</u>

Upon a showing that there is no genuine dispute of material fact as to a particular claim, the court may grant summary judgment in the party's favor on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FRCP 56(a) A material fact is one that could effect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

106 & 106-1). The County consented to the entry of this final judgment.

1  For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the
2  nonmoving party. *Ibid*.

3         The moving party must show that particular material facts cannot be genuinely
4  disputed by citing to evidence that establishes the material facts and/or showing that the
5  opposing party cannot produce admissible evidence to support material facts on which it
6  has the burden of proof. FRCP 56(c)(1)(A)-(B) "Disputes over irrelevant or unnecessary
7  facts will not preclude a grant of summary judgment." *T.W. Elec.Serv., Inc. v. Pacific*
   *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).

8         To avoid summary judgment, the opposing party must affirmatively show a
9  "genuine dispute" as to a "material fact." FRCP 56(c). The nonmoving party must present
10 affirmative evidence; "bald assertions" that genuine issues of material fact exist are
11 insufficient. *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir.2007). It is not
12 the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan*
13 *v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996) Counsel have an obligation to lay out their
14 support clearly. *Carmen v. San Francisco Sch. Dist.*, 273 F.3d 1026, 1031 (9th Cir. 2001).

15 **B.    Facial Challenge vs. "As-Applied" Challenge**

16        "A facial challenge to the constitutional validity of a statute or ordinance considers
17 only the text of the measure itself, not its application to the particular circumstances of an
18 individual." *Tobe v. City of Santa Ana*, 9 Cal.4th 1069, 1084 (1995) To support a
19 determine of facial unconstitutionality, the party must show "that the act's provisions
20 inevitably pose a present total and fatal conflict with applicable constitutional
   prohibitions." *Ibid*.

21        An as applied challenge seeks relief from a specific application of a facially valid
22 statute. *Ibid*. In an as applied challenge, the court evaluates the propriety of the
23 application on a case-by-case basis. *Ibid*.

24        Plaintiffs present a facial challenge to the County's policies concerning the
25 examinations conducted at PCC. However, in the event the Court does not find the
26 policies "present total and fatal conflict with applicable constitutional prohibitions,"

27
28

1   Plaintiffs request that the Court evaluate the propriety of the policies on an as-applied
2   basis.

3   **C.    Authority Supporting Plaintiffs' Challenge to County's Policies**

4           Plaintiffs claim that the County is liable under 42 USC §1983 for violating the
5   Mann Children's Fourth Amendment and the Mann Family's Fourteenth Amendment
6   rights. Under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658,
7   690 (1978), a local government agency can be sued for "constitutional deprivations
8   visited pursuant to governmental custom." The policy "need only cause [the]
9   constitutional violation; it need not be unconstitutional per se." *Chew v. Gates*, 27 F.3d
10  1432, 1444 (9th Cir.1994). "City policy 'causes' an injury where it is 'the moving force'
11  behind the constitutional violation." *Ibid*. There are no personal immunities (qualified or
12  absolute) available to municipalities under §1983. *Wallis v. Spencer*, 202 F.3d 1126,
    1143 (9th Cir.1999).

13          It is undisputed that at the time the Mann Children were seized from their home in
14  2010, County policy required full physical examinations, including examinations of the
15  "private parts," on all children admitted to PCC, regardless of the allegations that resulted
16  in their removal and detention at PCC,  regardless of the party against whom the
17  allegations of abuse were directed, and regardless of whether the parents consented to the
18  examinations. (SSUF 5, 8-10, 16-27) It is further undisputed that the County's policy
19  barred *any* parent from being present during the examinations. (SSUF 29)

20          The legal question for the Court on this motion is whether the County's policies
21  caused a violation of Plaintiffs' constitutional rights. The constitutionality question is
22  answered by the following Ninth Circuit and Southern District decisions: *Wallis v.*
23  *Spencer*, *supra; Parkes v. County of San Diego*, 345 F.Supp. 1071 (SD Cal.2004);
24  *Greene v. Camreta*, 588 F.3d 1011 (9th Cir.2009)[5]; and *Swartwood v. County of San*
    *Diego*, 2014 WL 7778999 (SD Cal. 2014).

25

26

27  ───────────
    [5] Section II.A. of *Greene v. Camreta*, which discussed whether the Greenes' rights were violated when
    one of the children was taken from her classroom and interviewed by a social worker, was later vacated
    consistent with instructions from the Supreme Court. *See Greene v. Camreta*, 661 F.3d 1201 (9th
28  Cir.2011). That section of the opinion is not pertinent to this discussion.

1.   _Wallis v. Spencer_

The Wallis family brought an action against the City of Escondido and others, alleging their constitutional and state law rights were violated when police officers removed the Wallis children from their parents and had them subjected to unauthorized medical examinations. Five-year-old Lauren Wallis and 2-year-old Jessie Wallis were seized by Escondido Police officers based upon their mistaken belief there was a court order to do so. Several days after they were taken from their home, physical examinations were performed on the children without court order or notification to the parents. The exams included vaginal and anal examinations.

The Ninth Circuit emphasized the "well elaborated" constitutional right of parents and children to live together without governmental interference, noting that right "is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." _Wallis, supra_, at 1136. _"The right to family association includes the right of parents to make important **medical decisions** for their children, and of children to have those decisions made by their parents rather than the state." Id. at 1141._ (Emphasis added) The court held that "[b]arring a reasonable concern that material physical evidence might dissipate [citation omitted], or that some urgent medical problem exists requiring immediate attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations." _Ibid._ The court also held that the parents had a right to be present during medical procedures, including examinations:

> "Moreover, parents have a right arising from the liberty interest in family association to be with their children _while they are receiving medical attention_ (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted.) Likewise, children have a corresponding right to the love, comfort, and reassurance of their parents _while they are undergoing medical procedures_, **including examinations**—particularly those, such as here, that are invasive or upsetting. The interest in family association is particularly compelling at such times, in part because of the possibility that a need to make medical decisions will arise, and in part because of the family's right to be together during such difficult and often traumatic events." _Id._ at 1142. (Emphasis added)

2.     *Parkes v. County of San Diego*

The medical examinations described in the *Parkes, supra,* decision are virtually identical to those in the present case. They included an initial evaluation by a nurse who performs "a general once-over, height, weight, vital signs" to determine whether the child is in need of immediate medical attention, and a subsequent physical examination—performed by Dr. Graff--"that includes an examination of the external genitalia, hymen and rectum, and pelvic examinations." *Parkes, supra*, at 1093. "This Court finds a medical examination that includes a pelvic examination and inspecting a child's external genitalia, hymen and rectum is significantly intrusive. Holly and Chloe have a legitimate expectation of privacy in not being subjected to a medical examination without their parents' consent." *Ibid*. "Defendant's contention that the examination takes less than one minute . . . does not effect the intrusive nature of an examination of genitalia." *Id*., at 1094, fn. 9.

The court held that the County's interest in protecting the health of the children in PCC did not outweigh the "invasive nature of the medical examinations performed without consent when the parent is available to authorize it." *Id*. at 1094. The *Parkes* court also held that the plaintiffs had a *Monell* claim based on their "protected liberty interest in having the parents present with the children when they receive medical attention." *Ibid*.

3.     *Greene v. Camreta*

Sarah Greene contended that the actions of a caseworker (Camreta) in subjecting her two young girls to sexual abuse examinations outside her presence violated the Greene's familial rights under the Due Process Clause of the Fourteenth Amendment. Because the girls' father had been indicted on charges of felony sexual assault, the order removing the Greene children from their home specified that an examination be performed at a center specializing in examinations of sexually abused children. Although Sarah Greene went to the center to be present during the exams ("fully intend[ing] to cooperate with the KIDS Center and lend whatever assistance and support [she] could to [her] daughter"), she was excluded from the premises. *Greene, supra,* at 1019.

1    One of the Greene girls testified that the examiners "'looked all over [her] body,'
2    'took pictures of [her] private parts,' and used a magnifying glass scope to visually
3    examine her." *Ibid*. She testified that she never told the doctor she felt uncomfortable or
4    asked to stop the interview, and that she felt fine after the examination was over and
5    didn't feel sick or upset.
6    The Greenes argued that Sarah's exclusion from her daughters' physical
7    examinations at the KIDS Center violated her "'substantive due process right to be there
8    for her children,' as well as S.G. and K.G.'s right 'to have their mother there when they
9    face *potentially* traumatic events, (emphasis added) such as the exams [performed at the
     KIDS Center].'" The Ninth Circuit Court of Appeals agreed. *Id*. at 1036.
10   The court stated that *Wallis, at 1141-42,* established "two points central here: first,
11   parents and children maintain clearly established familial rights to be with each other
12   during *potentially traumatic medical examinations*; and second, *this right may be limited*
13   *in certain circumstances to presence nearby the examination*, if there is some 'valid
14   reason' to exclude family members from the exam room during a medical procedure."
15   *Greene, supra, (*emphasis added).  Prohibiting Sarah from remaining in an adjoining or
16   nearby room, thus depriving her of any opportunity to comfort her children even after the
17   examination had been completed, violated her constitutional rights. *Id*. at 1037.

18
19        "The language of *Wallis* is clear and unambiguous: government officials
          cannot exclude parents entirely from the location of their child's physical
20        examinations absent parental consent, some legitimate basis for exclusion, or
          an emergency requiring immediate medical attention. *Id*. at 1141-42. The
21        KIDS Center assessments involved *the visual inspection* and photographing
          of the children's genitals. This process could certainly be emotionally
22        traumatic to a young girl. *Cf. Redding*, 129 S.Ct. at 2642 (citing a study
          concluding that strip searches can 'result in serious emotional damage.').
23        The children's right to their mother's comfort and their mother's right to
          provide such comfort were thus at their apex. Camreta's decision to exclude
24        Sarah not just from the examinations but from the entire facility where her
          daughter was being examined violated the Greene's clearly established
25        rights." *Ibid*.

26        4.    *Swartwood v. County of San Diego*

27   In *Swartwood*, as here, the plaintiffs challenged the constitutionality of the
28   County's policy for conducting medical examinations on children admitted to PCC. The

Plaintiffs claimed that the County policies precluding parents from attending their children's medical exams and allowing such examinations to be performed without parental notice or consent, without a court order regarding the specific child and in the absence of exigency were the moving force in violating plaintiffs Fourth and Fourteenth Amendment rights.

Like here, County argued its exams were authorized by court order and that parental consent was given *but not needed*.  Like here, County argued that the PCC exams were simply "medical assessments." Like here, the County argued there were valid reasons to exclude the parents. Like here, the County argued the exams were authorized by the 2007 Juvenile Court Order and complied with Welfare & Institutions Code §324.5. District Court Judge Thomas J. Whelan disagreed.

Because the issues identified by Judge Whelan were virtually identical to the issues before this court, the following discussion uses his decision as a roadmap.

**D.**   **County's Policy of Preventing Parents From Attending Their Child's Medical Procedures, Including Examinations**

County has admitted there is no dispute that its policy excludes parents from their children's medical examinations at PCC. (Document 135 ) As in *Swartwood*, County argues this policy does not violate constitutional rights because: 1) the examinations at PCC are "medical assessments" and not "forensic investigatory examinations"; and 2) there are valid reasons for excluding parents.  Neither argument is tenable.

1.   The Medical Procedures, Including Examinations, Are Unconstitutional

County argues the medical examinations conducted at PCC are radically different from the investigatory examinations discussed in *Wallis*. County characterizes its examinations as "health assessments" which are "consistent with recommendations of the American Academy of Pediatrics," and were "necessary to inform the physician of any urgent medical needs of the child and establish a baseline for medical treatment."

 Although the examinations conducted at PCC differ slightly from the examinations described in *Wallis*, they are almost identical to the examinations conducted in *Greene* (and identical in every way to the examinations conducted in *Parkes* and

*Swartwood*).  In all of those cases, the defendants also argued the exams were "assessments," rather than "forensic investigatory" exams. (Document 96, 16-17)[6]

In *Greene*, the child was told to undress, and the examiners looked all over her body, took pictures of her private parts, and used a magnifying scope to visually examine her. In *Parkes, Swartwood*, this case… and indeed in <u>all</u> exams conducted at PCC, the children were examined without their clothes on, and the children's genitalia and rectum were examined by the doctor—an examination which involved using the fingers to spread the labia and physically touching the children's private parts and anus. (SSUF 5, 22) In addition, the doctor's examination mandated that she check 22 other "items" identified on the PCC Admission Physical Examination form, including taking a urine samples to look for drugs. (SSUF 8, 24) Photographs were taken of the children where Dr. Graff believed she found signs of abuse. (SSUF 20)  Although a magnifying scope was not used during County examinations, "nothing in *Wallis* or *Greene* suggests that the Fourteenth Amendment liberty interest only applies where" the exam is identical to that described in those decisions. *Swartwood*, at 23.

In addition, the County's argument that the primary purpose of the exams is to ensure the well-being of the children at PCC belies the true facts. Dr. Graff testified that in accordance with San Diego County policies and procedures, her role is to investigate whether or not child abuse or neglect occurred. (SSUF 18-19) In addition, if the County's contention concerning the dangers to the children and PCC staff were true, *no child would be placed in the general population until the purported "health assessments" had been performed*.

Further, Dr. Graff testified that she is "looking for" signs of physical or sexual abuse, as well as other health conditions.  (SSUF 23) "The investigatory nature is also borne out by the fact that the exam involves the examination of '22 items,' and by Dr. Wright's statements that during the 'visual examination of the genitalia,' she is 'looking for signs of physical or sexual abuse' and that 'we take photos of any bruises or marks we see on the children during the examination." *Swartwood*, at 23. Dr. Graff's testimony, not

---

[6] As the Swartwood Court noted, the Defendants in Greene also referred to the exams as "assessment."

surprisingly, is no different than that of PCC's co-medical director Dr. Wendy Wright. (SSUF 8, 20, 23)

> "…even assuming the County's medical assessments are significantly different from the exams in *Wallis* and *Greene*, neither case indicates that a family's constitutional rights depend on how long the exam lasts or the degree of invasiveness. To the contrary, *Wallis* held that 'parents have a right arising from the liberty interest in family association to be with their children *while they are receiving medical attention . . .*' *Id.* 202 F.3d at 1142 (emphasis added). With regard to the children, *Wallis* held they have 'a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing *medical procedures . . .*' *Id.* (emphasis added)."*Swartwood*, at 24.

It is undisputed that children being examined at PCC, including the Mann Children, are receiving medical attention or undergoing a medical procedure, and there is no doubt that these procedures were "potentially upsetting." Thus, under the Ninth Circuit decisions in *Wallis* and *Greene*, and the Southern District decisions in *Parkes* and *Swartwood*, <u>*all parents*</u>, including the Mann Parents, had a constitutional right to attend their children's examinations at PCC; and <u>*all children*</u>, including the Mann Children, had a constitutional right to have their parents present at those examinations.

This court has questioned whether the examinations were unconstitutionally intrusive, or invasive characterizing them as a "visual inspection of external genitalia." [7] In fact, the examinations were far more intrusive than a simple "visual inspection." As described by Dr. Graff, all children who enter PCC, including the Mann Children, are asked to undress, are touched on their genitals, and are touched on their anus. (SSUF 5) The examinations performed on girls, including the Mann girls, involve the doctor using her fingers to spread apart the labia to inspect the hymen. (SSUF 9) These are "private parts" which all children are told should never be touched.

This court has also questioned whether the Mann Children "were particularly upset by the examinations and in need of their parents' care and comfort." While this may be relevant to the *damages* suffered by the plaintiffs as a result of the constitutional violations, it is not probative of the question of whether the County's policy is unconstitutional. In *Greene*, the Ninth Circuit explained that parents have "clearly

---

[7] In fact this Court has stated that there is a question of fact as to whether the examinations are "overly" intrusive and invasive. This qualifying term has never been used by any Court when analyzing these exams.

established familial rights to be with each other during *potentially* traumatic medical examinations." *Id*, 588 F.3d at 1036 (emphasis added). Use of the word 'potentially' necessarily means that the right is not contingent on the child becoming upset or traumatized. Indeed, the child in *Greene* testified that 'she felt fine after the examination was over and did not feel sick or upset.' *Id*. at 1019. Despite this testimony, the court held the child had a constitutional right to have her mother present, and the mother a constitutional right to be present. *Id.* at 1037." *Swartwood*, at 24.

Further, the evidence is *undisputed* that the examinations were upsetting to the children. The records indicate that one of the children was "too squirmy" to conduct a portion of the exam. (SSUF 11) And shortly after the children were returned to their parents' custody, one of the Mann girls demonstrated to her horrified mother, babysitter and grandmother how the doctor made her open her legs and used her fingers to spread apart her labia. (SSUF 32)

It is abundantly clear that the medical examinations conducted on Mann children at PCC pursuant to County policy require both parental consent and opportunity for the parents to be present during the exams under *Wallis* and *Greene*. Because the examinations conducted on the Mann Children were the same as were conducted on *all children* entering the facility, the policy and practice of the County in conducting these examinations without either are unconstitutional on their face (as well applied to these facts).

2.    County Has Stated no Valid Reasons for Excluding Parents from the Exams

As in *Swartwood*, County raised "numerous reasons" the government's interests in conducting an exam without the presence or consent of the parents outweigh clearly established familial rights, including "the preservation of the confidentiality of the other children's identities; the confidentiality of the other children's medical information; the inability to determine at such an early stage which parent may have abused the child; the limited availability of doctors to conduct the exams; and the possibility that a parent's presence could improperly influence the exam."

Not only does the County fail to show evidence of a valid reason to exclude parents from the PCC examinations in general, but it fails to show that any of its reasons applied to the Mann family.

The first "reason" listed above; the confidentiality of the identities of the other children and their medical records has been totally discredited. In *Greene*, the Ninth Circuit explained that a parent's right to be present "may be limited in *certain circumstances* to be present nearby the examination, if there is some 'valid reason' to exclude family members from the exam room during the procedure." *Greene*, 588 F.3d at 1036 (emphasis added.)

> "However, under the County's policy, the exception has become the general rule. It admits that all parents are excluded from their child's exam because of where the County has chosen to conduct its medical exams. Even more troubling, the evidence clearly establishes that—at the time of R.S. and D.S.'s medical exams—the County had known for approximately seven years, since its involvement in *Parkes*, that the location where it conducted the medical exams violated the family's constitutional rights, yet the County did nothing to relocate the exam room" *Swartwood*, at 26.

In this case, the County did not even make arrangements to allow the parents to be "nearby" during the examinations.

Further, the County has now *changed the physical plant at Polinsky* because of the ruling in *Swartwood*, and now allows parents to attend these exams, if they occur.[8] (SSUF 33) This change occurred within one month of the *Swartwood* decision, putting to rest County's claim that requiring such a change would jeopardize the existence of the facility itself! (SSUF 33-34)

Next, the County claims that it cannot determine who might have abused the child early in the investigation so it is appropriate to exclude everyone. Again, the County acknowledges that it *never* allowed parents to be present for the exam, *even if the parents are not suspected in the abuse*. (*See Swartwood*)

In this case, the County's claim is simply absurd. Mr. Mann, *who was the alleged "abuser,"* attended a medical examination of NEHM and MNAM by "child abuse

---

[8] The County also claims its policy change mandates that it obtain individualized Court orders if the parents do not consent to the examination, and that it has changed its "consent" form to inform the parents that they are allowed to be present during the exam. (SSUF 33)

experts" at Children's Hospital three days before the exams in question. (SSUF 35) These examinations, which were *at the behest of County Social workers*, were also attended by Defendant Cisneros. (SSUF 36) There is no evidence that Mr. Mann interfered with or attempted to manipulate those exams, or that either of the Mann Parents attempted to interfere or manipulate any other aspect of the detention proceedings. (SSUF 37) Likewise, there can be no inference that he, or Melissa, would have attempted to manipulate or interfere with the PCC exam.

Finally, the County has not shown that the presence of the Mann Parents would have unduly prolonged the examination, or that the children's examinations would have been delayed because of their parents' presence creating problems with "preserving evidence". The children were removed from their home on the afternoon of Monday April 12, 2010. (SSUF 38) The examinations were not performed until the following morning, April 13, between 8:40 am and 11:00 am. (SSUF 38) Further, as in *Swartwood,* the red mark on NEHM's back had already been photographed, and both NEHM and MNAM had been examined at Children's Hospital (with NGPM and MCGM standing by for examination if Cisneros' had deemed it necessary). (SSUF 39) Thus the County had no legitimate concern that evidence might be lost.

The County's justification for its blanket policy of excluding parents in general, or the Mann Parents under these facts specifically, from their children's medical procedures, including examinations, is insufficient to overcome the Fourteenth Amendment procedural due process and substantive fundamental liberty interests of familial association. This policy is unconstitutional on its face and as applied to these facts, and was the moving force in violating the Mann Family's constitutional rights. The Court should grant the Plaintiff's Motion for Summary Adjudication on this issue.

**E.    Lack of Parental Notice and Consent**

County's policies concerning PCC examinations also violate fundamental constitutional rights because they do not require parental consent, a valid court order, or exigency. Instead, they are routinely performed on *all children* who enter PCC, no matter

the circumstances.[9] The County claims that the exams were authorized by law and that the Mann Parents consented to the exams.

   1. <u>The PCC Exams are not Authorized by Law</u>

  County claims its exams are constitutional because they were authorized by a 2007 Juvenile Court Order  and complied with California Welfare & Institutions Code §324.5. Neither ground lends validity to the exams.

  The 2007 Order states that HHSA *may obtain* "a comprehensive health assessment as recommended by the American Academy of Pediatrics . . . for a child prior to the detention hearing in order to ensure the health, safety, and well being of the child." (SSUF 40) Under its terms, "the assessment may include one or more of the following, as is ***necessary and appropriate to meet the child's needs*** . . . b. A physical examination by a licensed medical practitioner." (SSUF 40) The County makes no individualized determination of the needs of the children entering PCC.

  Further, under *Wallis*, parental consent is unnecessary where a "judicial officer has determined, <u>*upon notice to the parents, and an opportunity to be heard,*</u> that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances." *Id*., 202 F.3d at 1141 (emphasis added). The 2007 Juvenile Court Order was a "general" order intended to be applicable to all children, without notice to the parents or an opportunity for them to be heard. Thus, it is insufficient on its face to authorize the medical exams at PCC in the absence of parental consent or exigent circumstances.

  The Mann parents had no notice or opportunity to be heard before the examinations of their children. The 2007 Order is thus insufficient to authorize the medical exams.

---

[9] Plaintiffs note that here, the allegations surrounding the Mann Children's removal were far less egregious than those surrounding the removal of the children in *Wallis* (father was accused of intending to ritually sacrifice his son), *Greene* (father was convicted of sexual abuse of a minor), and *Parkes* (daughter told her teacher that her father "tickled" her vagina). Here, the only claim was that Mr. Mann had caused a faint red mark on his daughter's back due to an accidental swat with a wooden spoon. *There was certainly NO compelling reason to conduct a vaginal and anal examination of children based on this allegation!*

1   Nor is there evidence that the assessment was "necessary and appropriate to meet"

2   the needs of the Mann Children. Two of the children had been examined by a Children's

3   Hospital "child abuse expert" on the Friday before the Tuesday examination at PCC, and

4   the County has not shown any evidence that the children had any medical needs. Instead

5   of demonstrating the exams were necessary or appropriate to "meet the needs of the

6   children" entering the PCC facility, the blanket examination of all children regardless of

7   the allegations that brought them to PCC, including the examination of the genitals and

8   "private areas," demonstrates that the County's policy is unconstitutional on its face as

9   well as applied to these facts.

10   Next, County asserts that the PCC exams were lawful under California Welfare &

11   Institutions Code §324.5. This statute requires a local law enforcement agency or local

12   child welfare department that takes a child suspected of physical or sexual abuse into

13   protective custody to "consult with a medical practitioner" specializing in child abuse to

14   "*determine whether a physical examination of the child is appropriate.*" (Emphasis

15   added) Cal. Welf. & Inst. Code §324.5(a). "*If deemed appropriate,*" the agency or

16   department "shall cause the child to undergo a physical examination" by a medical

17   practitioner specializing in child abuse, and "whenever possible, shall ensure that this

18   examination take place within 72 hours of the time the child was taken into protective

19   custody." *Ibid*.

20   There is nothing in this code section authorizing the County to perform

21   examinations without parental notice, consent, or parental presence or without court

22   order. *Wallis* recognized this, stating there is "no apparent conflict between the

23   requirements of this opinion and the statute in question." *Wallis*, 202 F3d at 1141, fn. 12,

24   citing *Tenenbaum v. Williams*, 907 F.Supp. 606 (EDNY 1995).[10]

---

[10] In *Tenenbaum*, the court found the defendants' broad reading of a similar statute that it gave authority "to consent to any type of medical services, not just those that are medically 'indicated' for treatment purposes, but also those that may be medically necessary to rule out or confirm such conditions as battered child syndrome, or sex abuse" was an unwarranted application of the statute. *Id.* at 615. The exam was not conducted "to provide medical treatment to the child, but to provide investigative assistance to the caseworker. . . . Time permitted parental and judicial involvement prior to the investigatory medical examination being conducted." *Id.* at 618.

2.     The County's "Consent" form does not constitute informed Consent

"A search conducted pursuant to a valid consent is constitutionally permissible." *Dubbs v. Head Start, Inc.,* 336 F.3D 1194, 1199 (10th Cir.2003). The consent is valid only when "it is objectively reasonable for the official to believe that the scope of a person's consent permitted him to conduct the search." *Id*.

Notwithstanding that there is *no question of fact* that the "Consent" forms signed by Mark and Melissa Mann were not presented to them and signed by them until *after* the examinations had already taken place (SSUF 30), these forms are *identical* to those discussed in *Swartwood*, and are invalid to authorize the exams.

By signing the "Consent for Treatment-Parent" form, a parent authorizes "medical, developmental, dental, and mental health care to be given" to his or her children "while . . . in any facility operated by the Health and Human Services Agency . . . if the treatment is recommended by a licensed physician, dentist, psychiatrist or other mental health practitioner." (SSUF 31) The form also lists a variety of procedures comprising "[m]edical, developmental, dental or mental health care," which includes the sole reference to "routine admission and placement examination." *Id*.

> The form is misleading because it strongly suggests at the time the document is signed that there are no plans to provide 'treatment' to the child. Instead, by indicating that such treatment will be provided 'if . . . recommended by a licensed' doctor, the form leaves the parent with the impression that there has been no determination made as to whether the child will receive any treatment. In reality, pursuant to the County's policy, when the form is signed, the child *shall* undergo a 'routine admission and placement examination.'" *Swartwood,* at 29.

In addition, "the County's repeated use of the term 'treatment' leaves the parent with the distinct impression that by signing the form, the parent is consenting to the child receiving medical care *if a condition*—such as a fever, cold, etc.—arises while the child is in the Polinsky Children's Center. *The form does not provide any notice that in executing the form, the parent is consenting to the County's mandatory 22-point health assessment that includes an examination of the child's external genitalia and rectum.*" *Ibid* (emphasis added).

As the Court stated in *Swartwood*, the County's consent forms create an "exercise in obfuscation and misdirection." (citing *Dubbs*, 336 F.3d at 1211). Reading the ambiguity against the drafting party (*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)), the forms fail to notify parents, including the Mann Parents, that their children would be subjected to mandatory physical examinations.        Both parents have testified that they had no idea that these forms allowed for the examinations of their children that actually took place, and both have stated that they would not have signed the forms had they been fully informed of same. (SSUF 41)

**F.    The Authority Cited by Defendants Is Inapplicable**

The case authority in the Ninth Circuit and the Southern District of California leads incontrovertibly to only one conclusion; that the County's policies concerning the PCC exams are unconstitutional on their face, and certainly as applied to the facts before the Court in this case.[11] Defendants therefore have attempted to look outside this Circuit to find authority to support their position. Cases outside this Circuit are not binding on this court. *Fidelity Nat. Financial, Inc. v. Friedman*, 855 F.Supp.2d 948, 969 (D. Arizona 2012)

However, even if the decisions cited by Defendants were binding on this Court, they do not apply to the question of the unconstitutionality of the medical exams.

*N.G. v. Connecticut*, 382 F.3d 225 (2nd Cir.2004) involved strip searches of female minors admitted to detention facilities to await trial following arrest for a serious juvenile offense. Interestingly, even in the case of incarcerated juvenile delinquents, the Government policy *precluded visual inspections of the vagina and anus*.

In *Smook v. Minnehaha County*, 457 F.3d 806 (8th Cir.2006), the county had a policy that officials must make an effort to contact a parent for 2 hours, and if the parent agreed to pick up the minor, the minor could not be searched or admitted to a secure area

---

[11] The single Ninth Circuit case cited by Defendants, *Mueller v. Auker*, 576 F.3d 979 (9th Cir.2009), involved a child who was seriously ill with potentially fatal spinal meningitis, whose mother refused to authorize a spinal tap to rule it out. The court discussion was of the immediate medical needs exception to the general rule.

of the facility. The policy also disallowed strip searches of juveniles without a probable cause determination.

In *Darryl H. v. Coler*, 801 F.2d 893 (7th Cir.1986), the court noted that because the case was only at a "very preliminary stage" of the litigation process, it did not have to reconcile the competing constitutional value concerns. However, the court did question whether nude searches of children by the Illinois Department of Children and Family Services were always reasonable or justified, and indicated that DCFS policies may ultimately need to be revised. *Id*. at 904.

## V. **CONCLUSION**

It is abundantly clear that the County's policies for conducting medical procedures, including examinations at Polinsky Children's Center in the absence of parental consent, parental presence, court order, and/or exigency violate the constitutional rights of the children and their parents. There have been four reported decisions finding that the constitutional right to family association outweighs any purported governmental interest in conducting these examinations. Three of these decisions involve San Diego County policies, and two involve the policies at County of San Diego's Polinsky Children's Center.

Rather than change its policy in response to the clear case law that it was unconstitutional, the County blithely continued to conduct medical procedures, including examinations, at PCC in the absence of consent, presence, valid order or exigency. Instead the County devised new justifications for its infringements on the constitutional rights of families who were already traumatized by separation, hoping that this would allow them to continue with "business as usual."

After 14 years, the County finally agreed to change its unconstitutional policies. This change was not soon enough for the Mann family, and the countless other families who were impacted by the County's refusal to recognize these fundamental constitutional rights.

Based on the foregoing argument, Plaintiffs respectfully submit that the Court enter an order finding the following County policies to be unconstitutional on their face:

1      1) The policy preventing parents or guardians from being present during medical

2 procedures, including examinations performed at Polinsky Children's Center;

3      2) The policy allowing medical examinations to be performed at Polinksy

4 Children's Center in the absence of exigency, valid parental consent, or court order

5 specific to the child being examined.

6      In the alternative, Plaintiffs request that the Court enter an order finding that the

7 facts outline by the Plaintiffs be deemed established and that the County policies set forth

8 above were the moving force behind the violation of the Fourth Amendment rights of the

Mann Children and the Fourteenth Amendment rights of the Mann family.

9

10 DATED: July 3, 2015            LAW OFFICE OF DONNIE R. COX

11                            */s/ Donnie R. Cox*

12                            DONNIE R. COX, Attorney for Plaintiffs

MARK MANN; MELISSA MANN;

13                            N.G.P.M., M.N.A.M., M.C.G.M, and N.E.H.M.

14                            minors by and through their Guardian Ad Litem,

BRUCE PAUL

15

16

17

18

19

20

21

22

23

24

25

26

27

28