

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARK MANN et al., | ) ) | Case No. 3:11-cv-0708-GPC-BGS |
| Plaintiffs, | ) ) | **ORDER:** |
| v. | ) ) ) | **(1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| COUNTY OF SAN DIEGO et al., | ) ) ) | [ECF No. 194] |
| Defendants. | ) ) ) ) | **(2) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| | | [ECF No. 197] |

In this civil rights case, Plaintiffs allege that Defendants violated their family's civil rights during a child abuse investigation that led to the removal of the minor children from the family's home. Compl., ECF No. 1. Before the Court are the parties' cross-motions for partial summary judgment. Defs. 2nd Mot. Summ. J. ("Defs. Mot."), ECF No. 194; Pls. 2nd Mot. Summ. J. ("Pls. Mot."), ECF No. 197. The motions have been fully briefed. Defs. Resp. to Pls. Mot. Summ. J. ("Defs. Resp."), ECF No. 201; Pls. Resp. to Defs. Mot. Summ. J. ("Pls. Resp."), ECF No. 202. A hearing on the motions was held on October 16, 2015 and the matter was taken under submission. ECF No. 210.

Having considered the parties' submissions, oral argument and the applicable law, and for the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion and **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion.

## BACKGROUND

The relevant facts in this case having been described in the Court's previous Order, the Court will not reiterate them in depth here. *See* 1st Summ. J. Order 2–12 ("Summ. J. Order"), ECF No. 102. In short, this is an action brought by Plaintiffs Mark and Melissa Mann and their four minor children N.E.H.M., M.C.G.M., N.G.P.M., and M.N.A.M ("Plaintiffs") challenging actions taken by the County of San Diego ("County"), the County's Health and Human Services Agency ("HHSA"), and the County's Polinsky Children's Center, a temporary emergency shelter for children who are separated from their families ("Polinsky") ("Defendants") during the course of a child abuse investigation that led to the removal of the minor children from the family's home. (*Id.*)

Plaintiffs initially filed a complaint against the County, HHSA, Andrea E. Hernandez (née Cisneros), Lisa J. Quadros, Gilbert Fierro, Kelly Monge, Susan Solis, and six other now dismissed defendants. Compl.; *see also* Orders Dismissing Defs., ECF Nos. 93, 142. Plaintiffs asserted eight causes of action for: (1) assault; (2) battery; (3) false imprisonment; (4) violation of federal civil rights guaranteed by the First, Fourth, and Fourteenth Amendments under 42 U.S.C. § 1983; (5) *Monell* claims related to the County's policies; (6) intentional infliction of emotional distress ("IIED"); (7) violation of state civil rights under Cal. Civ. Code § 43; and (8) violation of state civil rights under Cal. Civ. Code § 52.1. Compl. at 30–33.[1] Every cause of action was pled against all the Defendants, with the exceptions of the fourth cause of action for the § 1983 claims, which was pled solely against the individual defendants, and the fifth

---

[1] All page numbers refer to the pagination generated by the CM/ECF system, not the parties' original page numbers.

cause of action for the *Monell* claims, which was pled solely against the County, HHSA, and Polinsky. *Id*.

Following parties' initial cross-motions for partial summary judgment, the Court found that Defendants were entitled to qualified immunity with respect to Plaintiffs' fourth cause of action for the § 1983 claims to the extent that such claims were based on Defendants': (1) interview with N.G.P.M. at school; (2) examination of the children at Polinsky; and (3) listing of Mr. Mann on California's Child Abuse Central Index ("CACI"), but not with respect to their actions in obtaining and executing the protective custody warrant. Summ. J. Order 16–29. Defendants were granted summary judgment on Plaintiffs' *Monell* cause of action with regards to the charge of inadequate training. *Id.* at 30–31; Scheduling Order 8, ECF No. 190.

Subsequently, the Court found good cause to direct additional briefing in order to determine whether the following issues can be decided on summary judgment: (1) Plaintiffs' *Monell* cause of action based on the Polinsky exams; (2) Defendants' qualified immunity defense to Plaintiffs' § 1983 First Amendment retaliation claim; (3) all claims against Defendants Fierro, Monge, and Solis; and (4) Plaintiffs' state law causes of action of assault, battery, false imprisonment, IIED, and violations of Cal. Civ. Code § 43 and § 52.1. Scheduling Order 9–10. Parties' motions and responses followed.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, the court must "view[ ] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

Cross-motions for summary judgment do not necessarily permit the court to render judgment in favor of one side of the other. *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir. 1975). The Court must consider each motion separately "on its own merits" to determine whether any genuine issue of material fact exists. *Fair Housing*

*Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001); *Starsky*, 512 F.2d at 112. When evaluating cross-motions for summary judgment, the court must analyze whether the record demonstrates the existence of genuine issues of material fact, both in cases where both parties assert that no material factual issues exist, as well as where the parties dispute the facts. *See Fair Housing Council of Riverside County*, 249 F.3d at 1136 (citing *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 & n.5 (9th Cir. 2000)).

## DISCUSSION

### I.   Plaintiffs' *Monell* claims against the County, HHSA, and Polinsky

Plaintiffs bring *Monell* challenges to the County's policies of (1) preventing parents or guardians from being present during medical procedures, including examinations performed at Polinsky; and (2) allowing medical examinations to be performed at Polinsky in the absence of exigency, valid parental consent, or court order specific to the child being examined.[2] Pls. Mot. 14, 30.

#### a.     Factual Disputes

At the outset, it should be noted that the parties dispute whether issues of fact remain that preclude summary judgment on these claims. In its previous Summary Judgment Order, the Court found that disputed issues remained as to (1) whether the Polinsky examinations were overly intrusive in light of Defendants' justifications; (2) whether the County's policy of excluding all parents from examinations is warranted in light of Defendants' justifications; (3) whether the examinations were conducted primarily for investigatory purposes; and (4) whether the parents in this case consented to the examinations, but that since Plaintiffs failed to prove that the Polinsky examinations violated a clearly established right, Defendants were entitled to qualified immunity to the extent that Plaintiffs' § 1983 claims rested on the Polinsky examinations. Summ. J. Order 24–27. Subsequently, the parties indicated

---

[2] Plaintiffs bring both facial and as-applied *Monell* challenges. Pls. Mot. 14. However, as Plaintiffs do not point to any specific written statute, ordinance, or regulation being challenged on its face, the Court will analyze Plaintiff's *Monell* claims as as-applied challenges. *See id.*

that there were no factual disputes underlying Plaintiffs' *Monell* claims. *See* Defs. Ex Parte Mot. Requesting Leave to File 2nd Summ. J. Mot. 2 ("Defs. Ex Parte Mot."), ECF No. 135; Pls. Statement of Proposed Legal Issues to be Determined by the Court 3, ECF No. 189. This remains Plaintiffs' position, *see* Pls. Mot. 6, but Defendants now argue that there are disputed factual issues, *see* Defs. Resp. 2.

District courts retain inherent authority to revise interim or interlocutory orders any time before entry of judgment. *Abada v. Charles Schwab & Co.*, 127 F. Supp. 2d 1101, 1102 (S.D. Cal. 2000) (citing *Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996) ("[T]he interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment."); *Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461, 465 (9th Cir.1989); Fed. R. Civ. P. 54(b) (noting that unless final judgment has been entered, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities"). A district court may reconsider and reverse a previous interlocutory decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of controlling law. *Id.* (citing *Sport Squeeze, Inc. v. Pro–Innovative Concepts, Inc.*, 51 U.S.P.Q.2d 1764, 1771, 1999 WL 696009 (S.D. Cal. 1999); *Washington v. Garcia*, 977 F.Supp. 1067, 1068 (S.D. Cal. 1997)). But a court should generally leave a previous decision undisturbed absent a showing that it either represented clear error or would work a manifest injustice. *Id.* (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)).

The Court now concludes that it erred in previously finding that there were genuine issues of material fact as to the conduct of the Polinsky examinations. The Court now concludes that the disputed issues it previously identified (that is, (1)

whether the Polinsky examinations were overly intrusive in light of Defendants' justifications; (2) whether the County's policy of excluding all parents from examinations is warranted in light of Defendants' justifications; (3) whether the examinations were conducted primarily for investigatory purposes; and (4) whether the parents in this case consented to the examinations) are properly understood as legal issues that can be decided by the Court. As Defendants previously put it, "[t]here are no disputes about how the exams were conducted, or who conducted them, or whether the parents were present. The only question is whether the exams were lawful; this question should be decided by the Court." Defs. Ex Parte Mot. 2. Upon thorough review of the record, the Court now agrees with that position.

First, whether the Polinsky examinations were overly intrusive in light of Defendants' justifications is a legal question, not a factual one. We previously found, Summ. J. Order 24, and Defendants now argue, Defs. Resp. 11, that expert testimony may be required to resolve the question of whether the examinations were unconstitutionally intrusive. Defendants also now argue that "how the specific exams were conducted on the Mann children" themselves is a disputed issue. Defs. Resp. 11.

However, Defendants cannot materially dispute "how the exams were conducted, or who conducted them." Dr. Graff, the Co-Director of Polinsky who conducted the contested medical examinations on the Mann children, did testify that she did not specifically recall performing the medical exams on the Mann children, Graff. Dep. 67:22–24, ECF No. 198-2, and that because "[n]ot all of the children were cooperative with [external genital] examination," she was not able to "remember if [she] was able to complete that portion of the examination on all of the children," *id.* at 27:16–19. However, Dr. Graff previously declared that she "conducted the medical examinations of the Mann children in this case when they were admitted to Polinsky." Graff Decl. 2, ECF No. 77-5. Her declaration is supported by the record. Each of the Mann children's "Admission Physical

Examination" forms carries Dr. Graff's signature. *See* Pls. Mot., Exs. 8–11; *see also* Graff Dep. 67:16–18 ("Q. Okay. And whose signature is that? A. Where it says date and then going across to M.D., that's my signature. And that's my date there."). The nature of the examinations is also well-established by the record. Dr. Graff repeatedly agreed that the "frog leg" external genital examination was "the type of examination that was being conducted of children in 2010," *id.* at 26:25–27:7; *see also* 25:3–26:8; 68:1–11, and that the medical records confirm that she conducted at least N.G.P.M.'s exam, including an external genital/hymen examination, *id.* at 67:6–21 ("Q. So on 4-13-10, you conducted this examination of N.G.P.M.; correct? A. Yes." *Id.* at 67:19–21). Moreover, each form contains filled-in checkmarks and comments for the 22 assessment criteria. The "Extl Genitalia/Hymen" category is checked off under the first column "NL," the same as most of the other categories (such as "Skin," "Head," "Eyes," "Ears," "Nose/Mouth/Teeth," etc.), for each form except one, where it is checked off under the third column "NA," and under the "Description" field for that category the form states "unable to assess." *See id.* Thus, even viewing evidence in the light most favorable to the Defendants, there is no genuine dispute of material fact as to what type of examinations PCC conducted on the Mann children and whether Dr. Graff conducted the exams.

Defendants' contention that expert testimony is required to resolve the question of intrusiveness is likewise without merit. As an initial matter, it is difficult to countenance Defendants' argument that further testimony from Dr. Graff as to "how the specific exams were conducted on the Mann children" would be helpful, Defs. Resp. 11, given that Dr. Graff has already testified that she did not specifically recall performing those examinations, Graff. Dep. 67:22–24. But more importantly, as discussed above, what the examinations actually consisted of is not materially disputed. Instead, the legal question before the Court is the constitutionality of a medical examination with this *degree* of intrusiveness. In *Greene v. Camreta*, 588 F.3d 1011, 1036–37 (9th Cir. 2009)*, Wallis v. Spencer*, 202 F.3d 1126, 1141–42

(9th Cir. 1999), *Swartwood v. County of San Diego*, 84 F. Supp. 3d 1093, 1116–19 (S.D. Cal. 2014), and *Parkes v. County of San Diego*, 345 F. Supp. 2d 1071, 1092–95 (S.D. Cal. 2004), the Ninth Circuit and the Southern District of California respectively considered the constitutionality of several different types of medical examinations which took place during the course of child abuse proceedings, some of which concerned the same institutional Defendants as the present case. In each case, after the factual content of the medical examinations was established, the respective courts evaluated the constitutionality of the level of intrusiveness as a legal matter. *See id.*

Second, whether the County's alleged policy of excluding all parents from examinations was warranted in light of Defendants' justifications is a legal question. It is undisputed that parents were not permitted to be present during the medical examinations at the time the examinations on the Mann children were conducted. *See id.* at 110:17–110:22; 112:17–113:3; 113:17–113:24; *see also* Defs. Resp. to Pls. Separate Statement of Undisputed Material Facts 8 ("Defs. Resp. to Pls. SSUF", ECF No. 201-3 (stating that "[p]arents were allowed to be present at Polinsky in the visitation area, and to meet with the medical staff to discuss their child's medical issues," but not designating any specific facts to show that parents were permitted to be present in the medical examination itself). Whether that alleged policy violated Plaintiffs' constitutional rights is a legal question for the Court to decide. *See Greene*, 588 F.3d at 1036–37; *Wallis*, 202 F.3d at 1142; *Swartwood*, 84 F. Supp. 2d at 1117–19.

Third, whether the examinations were conducted primarily for investigatory purposes is a legal question. Again, what the examinations actually consisted of is not materially disputed. Instead, the legal question presented is whether this type of medical examination should be understood as investigatory. *See Greene*, 588 F.3d at 1036; *Wallis*, 202 F.3d at 1141–42; *Swartwood*, 84 F. Supp. 2d at 1118–19.

Fourth, whether the parents in this case consented to the examinations is a

legal question. The only action the Manns took that could conceivably be construed as consent for the medical examinations is signing the "Consent to Treatment-Parent" forms. *See* Defs. Resp. 10. Whether this form constituted actual consent is a legal question for the Court.[3] *See Swartwood*, 84 F. Supp. 2d at 1122–24.

Thus, although, as discussed below, other issues of material fact may remain that preclude grant of summary judgment on Plaintiff's *Monell* claims, the "disputed issues" previously identified by this Court are legal, not factual, disputes that are within the province of the Court to decide at the summary judgment stage.[4]

### b.   Legal Analysis

Under *Monell v. Dept. of Social Servs. of City of New York*, a municipality like the County can be sued for "constitutional deprivations visited pursuant to governmental custom." 436 U.S. 658, 690 (1978). To establish municipal liability where a municipality's inaction in failing to protect the plaintiffs' constitutional rights is the source of the deprivation, the plaintiffs must show that (1) they were deprived of a constitutional right; (2) the County had a policy; (3) the policy amounted to a deliberate indifference to the constitutional right; and (4) the policy was the "moving force behind the constitutional violation." *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001) (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996)).

### i.   Deprivation of a Constitutional Right

The first prong of the *Monell* analysis is whether there was the deprivation of

---

[3] Parties also dispute whether the "Consent to Treatment-Parent" forms were signed before or after the medical examinations were conducted. *See* Defs. Mot. 10. However, as discussed below in Part I.b.3, that issue is immaterial since in any event, the Court finds that the forms did not constitute legal consent.

[4] Defendants also contend that any reconsideration of our previous factual findings should be barred as untimely pursuant to Civ. L. R. 7.1(i)(2). However, Civ. L. R. 7.1(i)(2) is inapplicable because the Court is not entertaining a motion for reconsideration of our previous Summary Judgment Order. Indeed, the Court's previous factual findings were not necessary to the conclusion in that Order that Plaintiff's § 1983 claims should be dismissed insofar as they were based on the Polinsky examinations, because that decision also rested on the independent ground that Plaintiffs had not shown that their constitutional rights were clearly established at the time of the examinations. *See* Summ J. Order 27.

a constitutional right. Here, Plaintiffs challenge two of the County's alleged policies: (1) allowing medical examinations to be performed at Polinsky in the absence of exigency, valid parental consent, or court order specific to the child being examined; and (2) preventing parents or guardians from being present during medical procedures, including examinations performed at Polinsky. Pls. Mot. 14, 30. While, as discussed below in Part I.b.ii., it will be for the jury to decide whether the County did in fact have these policies, the Court now finds that only the second alleged policy of excluding parents from the medical examinations runs afoul of Ninth Circuit precedent delimiting the boundaries of Plaintiffs' rights to family association.[5]

### 1.    Applicable Law

"Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis*, 202 F.3d at 1136 (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923)). This "right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Id.* at 1141 (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979); *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999)).

Such a right is not absolute: the "rights of children and parents to be free from arbitrary and undue governmental interference" must be balanced against "the legitimate role of the state in protecting children from abusive parents." *Id.* at 1130; *see also Greene*, 588 F.3d at 1015–1016 ("On one hand, society has a compelling interest in protecting its most vulnerable members from abuse within their home. . . . On the other hand, parents have an exceedingly strong interest in directing the

---

[5] Defendants argue that disputed issues of fact preclude a decision on whether the medical examinations violated Plaintiffs' constitutional rights. Defs. Resp. 4. But as discussed above in Part I.a, the Court now finds that the disputed issues previously identified represent questions of law that the Court can decide on summary judgment.

upbringing of their children . . . .”). But as the Ninth Circuit has cautioned, “in the area of child abuse, as with the investigation and prosecution of all crimes, the state is constrained by the substantive and procedural guarantees of the Constitution.” *Wallis*, 202 F.3d at 1130.

In *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 1999), police officers removed the plaintiffs’ minor children from their home without a warrant following a baseless accusation from Mrs. Wallis’ mentally-ill sister that Mr. Wallis was planning to sacrifice his son in a satanic ritual. 202 F.3d at 1131–34. Three days after the children were removed, a hospital performed an evidentiary physical examination of both children, which included internal body cavity examinations of the children, and photographs of their genital areas. *Id.* at 1135. There was no prior judicial authorization or parental consent for the examinations. *Id.* In addition, the examinations were conducted without prior notice to the parents and without their physical presence. *Id.* In reversing a grant of summary judgment to defendants, the Ninth Circuit found that,

> [I[n the absence of parental consent, [physical examinations] of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances. Barring a reasonable concern that material physical evidence might dissipate, or that some urgent medical problem exists requiring immediate attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations.

*Id.* at 1141 (quotations omitted) (internal quotation mark omitted) (citations omitted). The court continued:

> Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted). Likewise, children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations—particularly those, such as here, that are invasive or upsetting.

*Id.* at 1142.

12

3:11-cv-0708-GPC-BGS

*Wallis* stands for two propositions. First, when the state conducts an evidentiary physical examination of a child which involves internal body cavity examinations or the collection of material physical evidence of abuse, "[b]arring a reasonable concern that material physical evidence might dissipate . . . or that some urgent medical problem exists requiring immediate attention," the state is constitutionally required to notify parents and to obtain judicial approval specific to that child prior to the examination. Second, when the state conducts such an evidentiary physical examination, parents have a constitutional right to be present at the examination, or to be in a waiting room or other nearby area if there is a valid reason for excluding them while the examination is being conducted.

In *Greene v. Camreta*, 588 F.3d 1011 (9th Cir. 2009), *vacated in part*, 563 U.S. 692, 131 S. Ct. 2020 (2011) *and vacated in part*, 661 F.3d 1201 (9th Cir. 2011) *as to unrelated Fourth Amendment issue*, the Ninth Circuit extended the scope of *Wallis*, but only with respect to the second issue of a parent's right to be present during the medical examination. In that case, the plaintiff's two daughters were removed from her custody pursuant to court order after plaintiff's husband and the father of the children, Mr. Greene, was arrested for suspected sexual abuse of another child. *Id.* at 1016–19. Several weeks after the children were removed, a medical center specializing in child sexual abuse performed "assessments" on the children, which involved visual examination of the children's genital areas, pictures of the genital areas, and the use of a magnifying glass scope to visually examine the children. *Id.* at 1019. The assessments took place with the parents' notice and consent as well as judicial authorization. *Id.* at 1018–19. However, when Mrs. Greene arrived at the medical center in advance of the scheduled assessments, she was barred from attending either child's medical assessment. *Id.* at 1019. The court found that *Wallis* established that:

> [F]irst, parents and children maintain clearly established familial rights to be with each other during potentially traumatic medical examinations; and second, this right may be limited in certain circumstances to presence nearby the examinations, if there is some

"valid reason" to exclude family members from the exam room during a medical procedure.

*Id.* at 1036 (citing *Wallis*, 202 F. 3d at 1142).

In *Greene*, the issue of whether such medical assessments require prior judicial authorization or parental consent did not arise, since the assessments took place with the parents' notice and consent as well as judicial authorization. *Id.* at 1018–19. Thus, the Ninth Circuit solely addressed the question of whether Mrs. Greene had a constitutional right to be present at her children's medical assessments. *Greene* stands for the proposition that when the state conducts a "potentially traumatic" medical examination of a child, such as one involving an external genital examination, parents have a constitutional right to be present at the examination, or to be in a waiting room or other nearby area if there is a valid reason for excluding them while the examination is being conducted.

The Court finds that *Wallis* and *Greene* establish constitutional rights that depend on the nature and intrusiveness of medical examinations of children conducted by the state.

First, *Wallis* establishes that where the medical examination at issue involves invasive *internal* body cavity examinations or the potential collection of material physical evidence, judicial authorization specific to the child or parental consent, plus notice to the parents is required. In addition, parents have a right to be present during the examination unless there is a valid reason to exclude them, such as a medical emergency, allegations of abuse, or a credible reason for believing they would interfere with the medical examination.

Second, *Wallis* and *Greene*, taken together, establish that where a "potentially traumatic" medical examination is at issue, such as one involving an *external* genital examination, parents have a right to be present unless there is a valid reason to exclude them, such as a medical emergency, allegations of abuse, or a credible reason for believing they would interfere with the medical examination. This right to be present necessarily encompasses a right to receive actual notice that the

14

1   examination will occur.[6] However, there is no constitutional requirement that the

2   state secure judicial authorization specific to the child or parental consent before the

3   examination is conducted.

4       Third, where a medical examination is *not* "potentially traumatic," neither

5   *Wallis* nor *Greene* are implicated. A routine pediatric examination involving, for

6   instance, auscultation or the testing of a child's reflexes would require neither

7   judicial authorization nor parental consent, notice, or presence.[7]

8                    **2.      Application to the Present Case**

9       Under the facts of the present case, Plaintiffs' constitutional rights were

10  implicated by Mrs. Manns' exclusion from the Polinsky examinations, but not by

11  the County's failure to obtain judicial authorization specific to the Mann children or

12  the Manns' consent prior to conducting the examinations.

13      The critical question is whether the medical examinations conducted at

14  *Polinsky* are more like the examination conducted in *Wallis*, or those conducted in

15  *Greene*. In *Swartwood v. County of San Diego*, 84 F. Supp. 3d 1093, 1121–22 (S.D.

16  Cal. 2014), the district court considered the same exams conducted by Polinsky that

17  are at issue in the present case, and found them to be virtually indistinguishable

18

19

20

21

22      [6] That said, this notice requirement does not require Polinsky to schedule examinations around
       the availability of parents. The Court is mindful of Dr. Wright's concern that scheduling around the
23     availability of the parents could negatively impact the ability of Polinsky's medical staff to perform
       a timely examination of each child, creating the possibility that "[b]ruising or other evidence of injury
       would diminish and medical problems could worsen" in the interim. Wright Decl. 6.
24

25      [7] The Court is mindful that another court in this district has seemingly extended *Wallis* and
       *Greene* to find that either judicial authorization specific to the child or parental consent is required
26     before the County can conduct Polinsky-style medical examinations involving external genital
       examinations. *See Swartwood*, 84 F. Supp. 3d at 1121. However, in so holding, the *Swartwood* court
       did not distinguish between the different factual predicates, and the different legal issues, presented
27     in *Wallis* and *Greene*. *See id.* at 1116-24. For the reasons discussed above, this Court finds that *Greene*
       addressed only the issue of parental presence, and so does not extend the scope of *Wallis'* holding
28     when it comes to the issue of whether judicial authorization or parental consent is necessary before
       the state conducts medical examinations of children.

from the "assessments" conducted in *Greene*.[8] First, Judge Whelan noted that the context and duration of the exams in *Greene* and here are similar. In both cases, what the County calls a "medical assessment" and what in *Greene* were called "KIDS Center assessments" involve a visual examination of the children's external genitalia. *See id.* at 1118; *see also* Part I.a. In *Greene*, photographs of the children's private parts were also taken; here, Dr. Wright testified that it was the policy of Polinsky as of 2011 to take pictures where sexual or physical abuse is discovered. *See Swartwood*, 84 F. Supp. 3d at 1118. As Judge Whelan put it,

> In light of these undisputed facts, the only distinguishing feature between the County's exams and the exam in *Greene* is the use of the magnifying scope. Nothing in *Wallis* or *Greene* suggests that the Fourteenth Amendment liberty interest only applies when a magnifying scope is used.

*Id.* Second, Judge Whelan observed that while there is a health component to the examination, there is no dispute that the exams also had an "investigatory nature" because the physician is "looking for" signs of physical and sexual abuse. *Id.* Indeed, here, Dr. Graff repeatedly confirmed that one of the purposes of the assessment was to investigate whether child abuse or neglect occurred. *See* Graff Dep., 51:3–14; 92:10–16. By contrast, comparing the present examinations with that conducted in *Wallis*, a significant difference emerges. The exams at Polinsky involve external genital examinations, not internal body cavity examinations of the type disapproved of in *Wallis*. Indeed, as Dr. Wright, Co-Medical Director at Polinsky testified, physically invasive "forensic sexual examinations to obtain and preserve medical evidence . . . are not conducted at Polinsky at all." Wright Decl. 5, ECF No. 96-7.

The Court finds Judge Whelan's reasoning persuasive on this issue. Accordingly, the Court finds that the type of medical examinations conducted in

---

[8] This Court has previously declined to give *Swartwood* issue preclusive effect, since "each of *Swartwood*'s decisions on the County's justifications were supported by at least one determination specific to the facts of that case." Scheduling Order 4. And as discussed above in Part I.b.i.1, this Court disagrees with *Swartwood*'s reading of the scope of *Wallis* and *Greene*. However, those findings do not preclude the Court from adopting reasoning from that case that the Court finds persuasive.

this case by Polinsky are similar to the medical assessments conducted in *Greene*, not the evidentiary physical examination conducted in *Wallis*. Thus, under the facts presented, Plaintiffs' constitutional rights were implicated by Mrs. Manns' exclusion from the Polinsky examinations, but not by the County's failure to obtain judicial authorization specific to the Mann children or the Manns' consent prior to conducting the examinations.

### 3.   Defendants' Counterarguments

Defendants argue Plaintiffs' constitutional rights were not violated because (1) there was judicial and statutory authorization for excluding the parents; (2) Plaintiffs were notified of and consented to the medical examinations; and (3) Defendants had valid reasons for excluding the parents.[9] The Court will consider each argument in turn.

### A.   Judicial and Statutory Authorization

Defendants argue that the medical examinations were authorized by both the 2007 Juvenile Court General Order ("General Order" or "Order"), Pls. Mot., Ex. 12, ECF No. 197-12, as well as Cal. Welf. & Inst. Code § 324.5. Defs. Resp. 4.

First, the General Order, issued on February 1, 2007 by Judge Susan D. Huguenor of the Superior Court of San Diego County, states in relevant part:

> 1.    HHSA may obtain a comprehensive health assessment as recommended by the American Academy of Pediatrics, including a mental status evaluation, for a child prior to the detention hearing in order to ensure the health, safety, and well-being of the child. The assessment may include one or more of the following, as is necessary and appropriate to meet the child's needs:
>
> . . .
> b.    A physical examination by a licensed medical practitioner.

General Order 1. The Order further provides that the Order itself will expire four

---

[9] Defendants also argue that *Wallis* and *Greene* apply only to "forensic investigatory exam[s]", not a "standard pediatric exam" as was conducted here. Defs. Resp. 5. Defendants assert that there are "many differences" between the two, "including the context and duration of the exams, the instruments used, and the purposes of the exams." *Id.* However, as discussed above, the Court finds that the relevant distinction is not whether or not an examination is "investigatory." Indeed, as Defendants suggest, all examinations include an "investigatory" component. *Id.* at 9. Instead, the key factual distinction is the *degree of invasiveness* of the examination.

years after date of issuance. *Id.* at 2. Since the medical examinations of the children were performed on April 13, 2010, *see* Mann Children's Admission Physical Exams, Pls. Mot., Exs. 8–11, Defendants argue that the Order was operative when the children were examined. Plaintiffs respond that even if the Order was operative, *Wallis* and *Greene* impose constitutional restraints on the operation of the Order. Pls. Mot. 25.

As an initial matter, the Court observes that the General Order does not actually address the role of the parents in any medical examination directed by HHSA. *See* General Order 1–2. Defendants urge that the absence of any mention of parental involvement should be understood as permission to proceed with the medical examinations without parental presence. But this Court does not understand the absence of any mention of parental role in the General Order as license to affirmatively bar parents from their children's medical exams. "In the area of child abuse, as with the investigation and prosecution of all crimes, the state is constrained by the substantive and procedural guarantees of the Constitution." *Wallis*, 202 F.3d at 1130. As discussed above in Part I.b.i.1, the Constitution mounts no barrier to the County's practice of conducting the Polinsky examinations in the absence of exigency, parental consent, or specific judicial authorization. But it does require that parents be allowed to be present during the examination unless there is an emergency or valid basis for exclusion.

Second, § 324.5 states in relevant part:

> (a) Whenever allegations of physical or sexual abuse of a child come to the attention of a local law enforcement agency or the local child welfare department and the child is taken into protective custody, the local law enforcement agency, or child welfare department may, as soon as practically possible, consult with a medical practitioner, who has specialized training in detecting and treating child abuse injuries and neglect, to determine whether a physical examination of the child is appropriate. If deemed appropriate, the local law enforcement agency, or the child welfare department, shall cause the child to undergo a physical examination performed by a medical practitioner who has specialized training in detecting and treating child abuse injuries and neglect, and, whenever possible, shall ensure that this examination take place within 72 hours of the time the child was taken into protective custody.

Whether § 324.5 authorizes the County's medical examinations has not been squarely addressed by previous courts. In *Wallis*, the Ninth Circuit suggested that "there is no apparent conflict between the requirements of this opinion and the statute in question." 202 F.3d at 1141 fn.12 (citing *Tenenbaum v. Williams*, 907 F. Supp. 606 (E.D.N.Y. 1995) (holding "that a New York statute authorizing local officials to give consent for medical services for a child in protective custody did not affect the court's conclusion that, nonetheless, due process required those officials to obtain judicial authorization for a purely investigatory examination issued after notice and an opportunity to be heard had been furnished to the parents," 202 F.3d at 1141 fn.12), *aff'd in part and vacated in part*, 193 F.3d 581, 604 (2nd Cir. 1999)). However, the *Wallis* court also found that they had "no occasion to consider whether or to what extent that law is affected by our decision here," since the law was not enacted until 1998, seven years following the medical examinations in that case. *Id.* By contrast, here, the medical examinations took place in 2010, and § 324.5 was in effect when the Mann children were examined.

The Court agrees with the Ninth Circuit's preliminary reasoning in *Wallis* that the statutory authorization for the medical examinations provided by § 324.5 does not override the due process guarantees of the Constitution. In *Greene*, defendants similarly argued that the medical examinations conducted in that case conformed with Oregon statutory and administrative law. 588 F.3d at 1021. But notwithstanding that fact, the Ninth Circuit concluded that the defendants nevertheless violated plaintiffs' clearly established constitutional rights by excluding the mother from the examination room. *Id.* at 1036–37.

## B.     Notice and Consent

Defendants argue that Plaintiffs were notified and consented to the medical examinations by signing the "Consent to Treatment-Parent" forms. Defs. Resp. to Pls. SSUF 5. This form states, in relevant part,

CONSENT FOR TREATMENT – PARENT

. . .

> I hereby authorize and give my consent for medical, developmental, dental, and mental health care to be given to the above-named child while he or she is in any facility operated by the Health and Human Services Agency of the County of San Diego or any licensed/certified foster home or public or private institution, if the treatment is recommended by a licensed physician, dentist, psychiatrist or other mental health practitioner.
>
> Medical, developmental, dental, or mental health care can include:
> •    Routine admission and placement examinations including blood test, immunization, and cervical cultures (when indicated).
> . . .
> I prefer treatment by:     [ ] Private Physician     [ ] Other Licensed Hospital/Medical Facility
>
> Name of Family Physician:_____   Telephone:_____
> Type of Medical Insurance:_____   Policy Number:_____
>
> If private treatment is selected and cannot, for any reason, be performed, I hereby authorize treatment at a licensed hospital/medical facility.

"Consent to Treatment-Parent" Form ("Consent Form" or "Form"), Pls. Mot., Ex. 13, ECF No. 208-4.

The argument that this same Consent Form constituted legal notice and consent was considered and rejected by the *Swartwood* court. Judge Whelan observed that there were multiple problems with construing the Form as providing notice and consent. Several of those rationales apply here.

First, the consent forms only permit "treatment at a licensed hospital/medical facility" "[i]f private treatment is selected and cannot, for any reason, be performed." In the form presented to the Court, Ms. Mann chose the "private physician" option and listed the name and telephone number of the family physician, as well as the type of medical insurance and policy number the family had. Consent Form. The form gives the impression that treatment by a "licensed hospital/medical facility" only occurs if the private treatment cannot be performed. However, Defendants have failed to argue, much less provide any evidence, that the Manns' family physician could not perform the children's medical assessments. *See also Swartwood*, 84 F. Supp. 3d at 1123.

Second, the Court agrees with Judge Whelan that:

The form is misleading because it strongly suggests at the time the document is signed that there are no plans to provide 'treatment' to the child. Instead, by indicating that such treatment will be provided 'if . . . recommended by a licensed' doctor, the form leaves the parent with the impression that there has been no determination made as to whether the child will receive any treatment. In reality, pursuant to the County's policy, when the form is signed, the child *shall* undergo a 'routine admission and placement examination.'

*Id.*

Thus, the Court agrees that the County's consent forms employ "'ambiguous language[']'" such that "a typical reasonable parent would not have understood the forms to constitute [notice or] consent to the administration of 'general physical exams.'" *Id.* at 1124 (citing *Dubbs v. Head Start, Inc.*, 336 F.3d at 1199, 1208 (10th Cir. 2003)).

## C.      Valid Reasons for Exclusion

Defendants argue that constitutional requirements notwithstanding, the County had valid reasons for excluding parents from the exams, including "not knowing the extent to which a 'non-offending' parent is involved in the allegations of abuse when children are first brought to Polinsky, the need to determine whether the children require urgent medical attention, the need to protect other children from contagious diseases, and the need to get a health baseline for future treatment and to protect the institution from allegations of abuse." Defs. Resp. 5.

As an initial matter, a number of these justifications can be dispensed with. First, it is not clear, and Defendants advance no evidence, as to why parents would pose a greater risk to other children in terms of contagious diseases by being permitted into the examination room then if they were otherwise present in the facility. Second, it is not clear how the presence of a parent at the medical examination in and of itself would interfere with the "need to determine whether the children require urgent medical attention" or the "need to get a health baseline for future treatment and to protect the institution from allegations of abuse." Both this objection and the objection regarding the lack of knowledge of the extent to which a 'non-offending' parent is involved in the abuse seem to presume that the parent

21

might interfere with medical examination.

But as the court found in *Swartwood*, the County cannot use a generalized presumption that parents could be disruptive as a basis for a blanket policy excluding all parents. As Judge Whelan put it, "the County's ability to exclude parents from their child's exam" should be understood as "an exception to the general rule that parents must be allowed to attend." 84 F. Supp. 3d at 1120. To hold otherwise would render meaningless the Ninth Circuit's determination that parents' right to present "may be limited *in certain circumstances* to presence nearby the examinations, if there is some 'valid reason' to exclude family members from the exam room during the procedure." *Id.* (citing *Greene*, 588 F.3d at 1036 (emphasis added)).

Defendants make the additional argument that in this case, since "social workers believed that Mr. Mann had caused the red welt on his daughter's hip, but the workers also knew that Ms. Mann had thrown the workers out of her house during their investigation after they asked to inspect a bruise on her son's head . . . [t]here were valid reasons to exclude both of the parents from the exams." Defs. Resp. 5. These factors might constitute "reasonable cause to believe that the parent is abusive, or perhaps, [that] the non-abusive parent is so emotionally distraught that they would disrupt the exam." *Swartwood*, 84 F. Supp. 3d at 1120. However, Defendants provide no evidence that these factors were actually relied upon by Polinsky in excluding the Manns. To be clear, allegations of abuse or a well-founded reason for believing a non-abusive parent may act disruptively are "valid reasons" under *Wallis* and *Greene* to exclude parents from medical examinations. But these determinations must be made specific to the parents in question, rather than being the assumptions underlying the blanket policy of the County as to all parents.

### ii.   Other *Monell* factors

Having found that Plaintiffs were deprived of their constitutional rights as

identified above, the remaining *Monell* factors are whether (2) the county had a policy; (3) the policy amounted to a deliberate indifference to the constitutional right; and (4) the policy was the moving force behind the constitutional violation. As to the second factor, parties dispute whether the County actually had the contested policies at issue here. Plaintiffs argue that Dr. Graff testified that the medical examinations were conducted according to the policies and procedures of the County of San Diego. Pls. SSUF in Support of Mot. Summ. J. 6 (citing Graff Dep., 51:12–14), ECF No. 197-4. Dr. Graff testified that she believed that it was Polinsky policy that parents were not allowed to attend medical examinations at Polinsky from 1994 to 2011. Graff. Dep. 110:17–22. However, when asked whether it was County policy to notify the parents before the examination occurs, she stated that while Polinsky did not notify the parent, she did not know "if the removing social worker or other agent informs the parent." Thus, there is some dispute over whether it was the overall policy of the County not to notify the parents before the examination occurred. Moreover, Defendants argue that "Dr. Graff was not a County employee and did not testify she was competent or knowledgeable about all County policies at Polinsky." Defs. Resp. to Pls. SSUF 6. Accordingly Court finds that whether the County actually had the contested policies is a disputed issue of material fact that must be decided by the jury.

Next, parties dispute whether the County's alleged policies would rise to the level of deliberate indifference of Plaintiffs' constitutional rights. To prove deliberate indifference, the plaintiff must show that the municipality was on actual or constructive notice that its failure to act would likely result in a constitutional violation. *See Gibson v. Cnty. Of Washoe*, 290 F.3d 1175, 1186 (9th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994))."[M]uch more difficult problems of proof" are thus presented in a deliberate indifference case than under traditional *Monell* liability. *Id.* (citing *Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406 (1997)). Deliberate indifference is generally

considered a jury question. *See id.* at 1195. The Court finds that whether the County acted with deliberate indifference is a disputed issue of material fact that must be decided by the jury.

The final aspect of the *Monell* inquiry is whether the County's alleged policies were the "moving force" behind the constitutional violation, *Monell*, 436 U.S. at 694, or as the Supreme Court has sometimes put it, whether there is a "direct causal link" between a municipal policy and the alleged constitutional deprivation, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). Dr. Graff testified that she conducted the medical examinations without the presence of the parents in accordance with what she believed to be Polinsky policy. Graff. Dep. 110:17–22. Defendants have designated no facts that would present a material dispute as to Dr. Graff's reliance on what she believed to be County policy. Thus, there seems little doubt that should the other *Monell* prongs be satisfied, there would be a "direct causal link" between the County's policies and the constitutional violation of excluding the parents from the medical examination.

### iii.   Conclusion

For the foregoing reasons, the Court finds that Plaintiffs have satisfied steps (1) and (4) of the *Monell* analysis (as to the unconstitutionality of the County's alleged policy of excluding parents from medical examinations, and the causal relationship between the County's alleged policy and the constitutional violation). However, the Court finds that steps (2) and (3), (i.e.,whether the County had the challenged policy, and whether the policy amounted to a deliberate indifference to the Plaintiffs' constitutional rights), are questions for the jury to decide. Accordingly, Plaintiffs' motion for summary judgment on the *Monell* claims is **GRANTED IN PART** and **DENIED IN PART**.

## II.   Defendants' qualified immunity defense to Plaintiffs' § 1983 First Amendment retaliation claim

Defendants argue that they are qualifiedly immune from Plaintiffs' claim that

the social workers were retaliating against Plaintiffs for complaining about their conduct, in violation of Plaintiffs' First Amendment rights, when the social workers acted to remove the children from the Mann home. Defs. Mot. 10.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986). Thus, on summary judgment, a court "appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Harlow*, 457 U.S. at 818; *see also Davis v. Scherer*, 468 U.S. 183, 183 (1984) (holding that "[a] plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue").

"If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19. But, "if the [government] official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." *Id.*; *see also Anderson v. Creighton*, 483 U.S. 635, 638 (1987) ("[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley*, 475 U.S. at 341)).

In sum, "[w]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time the action was taken." *Anderson*, 483 U.S. at 635. That is, "[t]he relevant question . . . is the objective question whether a reasonable officer could have believed [the conduct at issue] to be lawful, in light of

clearly established law and the information the [officer who engaged in the conduct at issue] possessed." *Id.* at 636; *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001) (setting forth two-step analysis for resolving government officials' qualified immunity claims); *but see Pearson v. Callahan*, 555 U.S. 223, 227 (2009) (holding that two-step *Saucier* analysis should not be regarded as an inflexible requirement, but that a court may consider the steps as the court deems appropriate in its discretion).

Parties dispute the level of generality at which to define the phrase "clearly established law." Defendants argue that no case has applied the First Amendment right against retaliation in the context of social workers removing children from their parents' care. Defs. Mot. 9. Plaintiffs rejoin that the proper inquiry is whether the First Amendment right against retaliation applies in the context where there was no probable cause to arrest or prosecute the individuals who brought the action. Pls. Resp. 12.

While the Court is mindful that "[a] right can be established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances," this is not a case that involves the "mere application of settled law to a new factual permutation." *See Ford v. City of Yakima*, 706 F.3d 1188, 1195–6 (9th Cir. 2013) (quotations omitted) (internal quotation marks omitted) (citations omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). Here, every case cited by Plaintiffs to support the proposition that Defendants violated clearly established law concerns retaliatory arrests and detentions of individuals exercising their First Amendment rights by *police officers*. *See* Pls. Resp. 11–17. In *Ford*, for instance, the Ninth Circuit found that previous precedent barring police officers from acting based on retaliatory animus clearly established the unconstitutionality of retaliatory booking and jailing by police

officers. *See* 706 F.3d at 1196. Plaintiffs point to no cases supporting the proposition that the contours of the right have been held to extend to the actions of social workers removing children from their parents' homes.

Indeed, the Ninth Circuit has made clear distinctions between criminal and child welfare proceedings in the context of comparing criminal prosecutions and civil foster care proceedings. In *Costanich v. Dept. of Social and Health Services*, 627 F.3d 1101, 1115 (9th Cir. 2010), the court observed:

> The special duties of prosecutors and the unique interests at stake in a criminal action do not parallel the duties and interests at stake in a civil child custody proceeding. [The State's]"paramount concern" for safeguarding and protecting the health and safety of foster children, for example, places a special duty on DSHS officials to vigorously investigate allegations of child abuse. Furthermore, it is clear that [state] foster care licensees' and custodial guardians' interests do not rise to the level of a criminal defendant's interests, which are clear and long-established.

*Id.* at 1115 (citations omitted). While not all aspects of *Costanich* are on all fours with the instant case, the Court takes into consideration *Costanich*'s general admonition that criminal proceedings are not sufficiently analogous to child welfare proceedings that a court can conclude that a right delineated in the former context is "clearly established" in the latter. *See id.* at 1115–16. Thus, this is not a situation where the right is "sufficiently clear" such that "every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quoting *Ashcroft*, 131 S. Ct. at 2078) (internal quotation marks omitted) (alteration in original). Accordingly, Defendants' motion for summary judgment based on qualified immunity with respect to Plaintiffs' § 1983 First Amendment retaliation claim is **GRANTED**.

## III.   All claims against Defendants Fierro, Monge, and Solis

### a.   Claims against Defendant Fierro

Defendants argue that the seven claims against Defendant Fierro (the manager of Defendant Quadros, who was the supervisor of social worker Defendant Hernandez) should be dismissed. Defs. Mot. 15.

### i.   Federal § 1983 claim

First, Defendants argue that the federal § 1983 claim for violation of Plaintiffs' Fourth and Fourteenth Amendment rights should be dismissed because Fierro did not prepare, review, or edit the warrant application or detention report.[10] (*Id*.) The Court previously declined to grant Defendants summary judgment on the constitutionality of the process of obtaining and executing the protective custody warrant. Summ. J. Order 19. The Court found that Defendants had omitted material facts in the warrant, and that had the omitted information been included, the warrant would not have supported a finding of probable cause. (*Id*.) The Court then found that genuine issues of material fact remained as to whether the social workers intentionally or recklessly falsified the warrant application or detention report. (*Id*.)

Defendants argue that there is neither evidence that Fierro intentionally or recklessly falsified the warrant application or detention report, nor that he was involved in preparing, reviewing or editing either document. Defs. Mot. 16. Plaintiffs respond that even if this is so, Fierro is still liable under a theory of supervisory liability. Pls. Resp. 20.

Personal participation is not the only predicate for § 1983 liability. *Johnson v. Duffy*, 588 F.2d 740, 743 (1978). Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. *Id.* In order to be held liable, a "supervisor need not be 'directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury.'" *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011) (quotation omitted). A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). "[A] plaintiff must show the

---

[10] As discussed above in Part II, the Court dismisses Plaintiffs' First Amendment claim as to all Defendants.

supervisor breached a duty to plaintiff which was the proximate cause of the injury." *Starr*, 652 F.3d at 1207. "The requisite causal connection can be established . . . by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207–08 (quotations omitted) (internal quotation marks omitted). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)) (internal quotation marks omitted).

Here, plaintiffs have failed to designate specific facts to show that there is a genuine issue for trial. Plaintiffs argue that Fierro spoke with Melissa Mann about her concerns regarding Defendant Hernandez, participated in at least one meeting concerning the Mann family, and was involved in the decision to remove and detain the children. Pls. Resp. 18. They point out that in response to questioning about who made the decision to request a protective custody warrant, Hernandez testified in her deposition that "[t]he entire time I'm consulting with my supervisor and manager as to how to proceed in the case," and that she "believe[d]" that Fierro was involved with the decision to get the protective custody warrant. (Hernandez Dep. 219:20–24, ECF No. 202-3.) And her supervisor Defendant Quadros testified that the process for deciding to pursue a protective custody warrant included "consult[ing] with [the] manager . . . to get a consensus about what's the appropriate action[] to take at that time." (Quadros Dep. 189:17–20, ECF No. 202-4.)

However, viewing the evidence in the light most favorable to the Plaintiffs, even if Fierro was involved in the decision to pursue the protective custody warrant, Plaintiffs point to no evidence that Fierro knew or reasonably should have known that his employees would intentionally omit material facts in the warrant application

or detention report. While Plaintiffs might be able to argue that Fierro "set in motion" the procedure for obtaining the warrant, the requisite "series of acts" set in motion here was not the decision to obtain the warrant, but to omit material facts in the warrant that would have defeated probable cause. Nor are there any facts identified by Plaintiffs that would support a finding that Fierro was culpable in his training Hernandez and Quadros, that he acquiesced in the omission of material facts in the warrant, or that his conduct demonstrated a reckless or callous indifference to the rights of others. Indeed, Fierro was responsive to Melissa Mann's initial complaint to the extent that he responded by sending a more senior social worker to accompany Hernandez on her next visit. Pls. Separate Stipulation of Undisputed Material Facts in Support of Opp. to Defs. Mot. Summ. J. 2, ECF No. 202-1. Accordingly, Defendants' motion for summary judgment on the federal § 1983 claim against Fierro is **GRANTED**, and the claim is **DISMISSED** as to Fierro.

### ii.    State law claims

Defendants argue that Fierro is entitled to absolute immunity from the six state law claims because government actors such as social workers have absolute immunity when they make discretionary decisions involving removal of children from their parents' care. Defs. Mot. 17–18 (citing Cal. Gov't Code § 820.2; *Alicia T. v. Cnty. of Los Angeles*, 222 Cal. App. 3d 869, 881 (Ct. App. 1990) (noting that because "[i]t is necessary to protect social workers in their vital work from the harassment of civil suits and to prevent any dilution of the protection afforded minors by the dependency provisions of the Welfare and Institutions Code . . . social workers must be absolutely immune from suits alleging the improper investigation of child abuse, removal of a minor from the parental home based upon suspicion of abuse and the instigation of dependency proceedings")).) Plaintiffs contend that this provision does not apply where the government actor, acting with malice, (1) committed perjury; (2) fabricated evidence; (3) failed to disclose known

exculpatory evidence; or (4) obtained testimony by duress. Pls. Resp. 20–21 (citing Cal. Gov't Code § 820.21). However, as discussed above in Part III.a.i., Plaintiffs have failed to identify specific facts supporting their claim that Fierro committed any of these acts. Accordingly, Defendants' motion for summary judgment on the state-based claims against Fierro is **GRANTED**, and the claims are **DISMISSED** as to Fierro.[11]

### b.     Claims against Defendants Monge and Solis

Defendants argue that the seven claims against Defendants Monge and Solis should be dismissed because they were not involved in the removal of the children. Defs. Mot. 21. Plaintiffs note that they only assert claims against Monge and Solis as to violations of § 1983, IIED, and violations of state civil rights laws under Cal. Civ. Code§ 43 and § 52.1. Pls. Resp. 23.

### i.     Federal § 1983 claim

Defendants argue that the Fourth and Fourteenth § 1983 claims against Monge and Solis should be dismissed because neither was involved in the initial removal of the children, and both are entitled to absolute immunity from any § 1983 claims arising from their acts or omissions in following a court order.[12] Defs. Mot. 21. Plaintiffs argue that the § 1983 claims survive because a jury could infer that Monge and Solis "continued to conceal the true facts from the court during the continuing legal proceedings in an effort to retaliate and cover up the misconduct of Defendants Hernandez, Quadros and Fierro." Pls. Resp. 24.

It is undisputed that social worker Monge and her supervisor Solis only became involved in the case when it was transferred to Monge, a member of the County's Court Intervention Unit, following the issuance of a Protective Order

---

[11] Because the Court finds that Fierro is entitled to absolute immunity on the state law claims, the Court will not address Defendants' additional arguments as to why Fierro is not liable on each state-based claim. *See* Defs. Mot. 19–20.

[12] As discussed above in Part II, the Court dismisses Plaintiffs' First Amendment claim as to all Defendants.

removing the children to Polinsky by the Juvenile Court and the subsequent return of the children to the Mann home. Pls. Opp. and Resp. to Defs. Separate Statement of Undisputed Material Facts 3, ECF No. 203. As such, Monge and Solis played no role in the initial removal of the Mann children. Moreover, Monge and Solis are entitled to absolute immunity with respect to the actions they took following the court order. *See Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010) (noting that "[a]bsolute immunity is extended to state officials, such as social workers, when they are performing quasi-prosecutorial and quasi-judicial functions" such as the execution of court orders); *Mabe*, 237 F.3d at 1109 (holding that "social workers 'enjoy absolute, quasi-judicial immunity when making post-adjudication custody decisions pursuant to a valid court order'" (quotation omitted)); *see also Engebretson v. Mahoney*, 724 F.3d 1034 (9th Cir. 2014) (holding that prison officials charged with executing facially valid court orders enjoy absolute immunity from § 1983 liability for conduct prescribed by those orders).

Plaintiffs rely on *Tatum v. Moody*, 768 F.3d 806, 816 (9th Cir. 2014) to argue that their Fourteenth Amendment due process rights were violated by Monge and Solis' failure to come forward with exculpatory evidence. (*See* Pls. Resp. 24. However, *Tatum* held that investigatory officers violate the Fourteenth Amendment where, acting with deliberate indifference or reckless disregard for a suspect's right to freedom from unjustified loss of liberty, they fail to disclose known, potentially dispositive exculpatory evidence to prosecutors. 768 F.3d at 816. Here, Plaintiffs have failed to designate specific facts demonstrating either that Monge and Solis had investigatory responsibilities with respect to the previous actions of Hernandez and Quadros, or that Monge and Solis knew or should have known that material facts had been omitted in the warrant application and detention report. Although Plaintiffs assert that "[b]y virtue of their review of [the Delivered Service Log, the Detention Report, and the Warrant Application], Monge and Solis knew that evidence concerning the Manns' cooperation with the County had been omitted

32

from the Detention Report and Warrant Application," Pls. Resp. 24, Monge denies, and Solis does not state, that they noticed the omissions in their initial review of the documents, *see* Monge Dep. 178:18; Solis Dep. 17:14–25. Nor do Plaintiffs explain how *Tatum* would defeat Monge and Solis' absolute immunity. Accordingly, the Defendants' motion for summary judgment on the § 1983 claims against Monge and Solis is **GRANTED**, and the claims are **DISMISSED** as to Monge and Solis.

### ii.   State law claims

Defendants argue that Monge and Solis, like Fierro, are entitled to absolute immunity from the six state law claims because government actors such as social workers have absolute immunity when they make discretionary decisions involving removal of children from their parents' care. Defs. Mot. 22. Plaintiffs again contend that this provision does not apply where the government actor, acting with malice, committed perjury, fabricated evidence, failed to disclose known exculpatory evidence, or obtained testimony by duress. Pls. Resp. 25. As discussed above in Part III.b.i, Plaintiffs have failed to identify specific facts supporting their claim that Monge and Solis committed any of these acts. In particular, Plaintiffs have not designated specific facts demonstrating that Monge and Solis knew of the omissions made by Hernandez and Quadros in the warrant application and detention report. Accordingly, the Defendants' motion for summary judgment on the state-based claims against Monge and Solis is **GRANTED**, and the claims are **DISMISSED** as to Monge and Solis.[13]

## IV.   Plaintiffs' state law causes of action against remaining individual Defendants Hernandez and Quadros

### i.   § 52.1 claims

Defendants argue that Plaintiffs' claim against Hernandez and Quadros for

---

[13] Because the Court finds that Monge and Solis are entitled to absolute immunity on the state law claims, the Court will not address Defendants' additional arguments as to why Monge and Solis are entitled to other forms of immunity and are not liable on each state-based claim. (*See* Defs. Mot. 22–27.

violation of state civil rights under Cal. Civ. Code § 52.1 should be dismissed because § 52.1 requires interference with civil rights by use of threats, intimidation, or coercion. Defs. Mot. 27 (citing *Venegas v. Cnty. of Los Angeles*, 153 Cal. App. 4th 1230, 1242 (2007)). Plaintiffs respond that § 52.1 does not require threats, coercion, or intimidation independent from the threats, coercion, or intimidation inherent in the alleged constitutional or statutory violation, or that in the alternative, Hernandez and Quadros did threaten, coerce, or intimidate Plaintiffs. Pls. Resp. 26–27 (citing *D.V. v. City of Sunnyvale*, 65 F. Supp. 3d 782, 789 (N.D. Cal 2014)).

The Court finds Plaintiffs' position more persuasive. *Venegas* did not determine whether the "threats, coercion, or intimidation" required by § 52.1 must be independent from that inherent in the alleged constitutional or statutory violation, instead focusing on whether qualified immunity applies to § 52.1 actions (and finding it did not). *See Venegas*, 153 Cal. App. 4ths at 1240–1247. Subsequently, the majority of courts interpreting *Venegas* and its progeny have concluded that where defendants act intentionally rather than negligently, § 52.1 does not require threats, coercion, or intimidation independent from the threats, coercion, or intimidation inherent in the alleged constitutional or statutory violation. *See, e.g.*, *Sunnyvale*, 65 F. Supp. 3d at 787–789; *Estate of Lopez ex rel. Lopez v. City of San Diego*, 2014 WL 7330874, at *15 (S.D. Cal Dec. 18, 2014). Here, the Court already previously found that genuine issues of fact remain as to whether Defendants Hernandez and Quadros were retaliating against Plaintiffs for challenging their authority in preparing and filing the detention report and warrant application and removing exculpatory evidence from those documents. Summ. J. Order 20. If Defendants did retaliate against Plaintiffs by acting to remove their children, those actions would be coercive and intimidatory. Thus, Defendants' motion for summary judgment on Plaintiffs' § 52.1 claims is **DENIED**.

### ii.    Polinsky examinations

Defendants argue that to the extent that any of Plaintiffs' state law claims rest

on the manner in which the Polinsky examinations were conducted, Hernandez and Quadros (the only remaining individual defendants) are not liable because there is no evidence that they ordered, participated in, or were present during the medical exams. Defs. Mot. 28. Plaintiffs argue that the harm caused by the Polinsky examinations is a directly foreseeable consequence of Hernandez and Quadros' actions in seeking the removal of the Mann children, and that Hernandez and Quadros were the "but for" cause of that removal. Pls. Resp. 27.

As to Plaintiffs' state law tort claims, since it is undisputed that Hernandez and Quadros were not personally involved in the Polinsky examinations, Plaintiffs can only succeed if Hernandez and Quadros "aided and abetted" the examinations. However, California tort law requires that a defendant subjected to liability for aiding and abetting a tort must have (1) known the other's conduct constituted a breach of duty and given substantial assistance or encouragement to the other to so act; or (2) given substantial assistance to the other in accomplishing a tortious result where the person's own conduct, separately considered, constituted a breach of duty to the third person. *Austin B. v. Escondido Union School Dist.*, 149 Cal. App. 4th (2007) (citing *Casey v. U.S. Bank Nat'l Assn.*, 127 Cal. App. 4th 1138, 1144 (2005)). In addition, "California courts have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted." *Casey*, 127 Cal. App. 4th at 1145. Here, Plaintiffs have pointed to no evidence that Hernandez and Quadros had any actual knowledge of what the procedures at Polinsky were, nor that Hernandez and Quadros had any actual knowledge that those procedures constituted any breach of duty. Accordingly, Defendants' motion for summary judgment on Plaintiffs' state law tort claims against Hernandez and Quadros to the extent that they rely on the

1    Polinsky medical examinations is **GRANTED**.[14]

2                        **CONCLUSION**

3      Based on the foregoing, **IT IS HEREBY ORDERED** that:

4    1.     Defendants' motion for summary judgment (ECF No. 194) is

5         **GRANTED IN PART** and **DENIED IN PART**;

6         a.    Defendants' motion for summary judgment based on qualified

7            immunity with respect to Plaintiffs' § 1983 First Amendment

8            retaliation claim is **GRANTED**;

9         b.    Defendants' motion for summary judgment on all claims against

10            Fierro, Monge and Solis is **GRANTED**;

11         c.    Defendants' motion for summary judgment on Plaintiffs' § 52.1

12            claims as to Hernandez and Quadros is **DENIED**;

13         d.    Defendants' motion for summary judgment on Plaintiffs' state

14            law tort claims against Hernandez and Quadros to the extent that

15            they rely on the Polinsky medical examinations is **GRANTED**;

16    2.     Plaintiffs' motion for summary judgment on the *Monell* claims (ECF

17         No. 197) is **GRANTED IN PART** and **DENIED IN PART**;

18    3.     Defendants Fierro, Monge, and Solis are **DISMISSED** from this action

19         with prejudice.

20     **IT IS SO ORDERED.**

21

22   DATED:  November 20, 2015

23

24                    HON. GONZALO P. CURIEL
                    United States District Judge

25

26

27 _____

28     [14] Since parties did not provide any argument or citation on whether Plaintiffs' state law civil rights claims can rest on the Polinsky examinations, the Court will not address this issue.